AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America

v.

RICHARD SCOTT,

aka David Richard Scott

aka Richard Janovitz

Defendant(s)

Case No.

17MJ 02770

FILED
CLERK, U.S. DISTRICT COURT

NOV 3 2017

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

LODGED
CLERK, U.S. DISTRICT COURT

NOV - 3 2017

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of January 29, 2016 in the County of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1031 | MAJOR FRAUD AGAINST THE UNITED STATES |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/

*Complainant's signature*

MICHAEL TORBIC, Special Agent

*Printed name and title*

Sworn to before me and signed in my presence.

Date:  11/3/17

City and state:  Los Angeles, California

ALKA SAGAR

*Judge's signature*

Hon. ALKA K. SAGAR, U.S. Magistrate Judge

*Printed name and title*

WARRANT

ATTACHMENT TO COMPLAINT

Offense Description:

Beginning on or date unknown in or before November 2003, and continuing through and including at least June 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendant Richard Scott ("defendant") , in connection with a procurement of property or services awarded under a contract with the Veteran's Administration ("VA") valued in excess of $1 million, devised a scheme to defraud the United States and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

On or about January 29, 2016, within the Central District of California, defendant, knowingly executed and attempted to execute a scheme to defraud the VA, an agency of the United States, with the intent to defraud the United States and obtain money and property by means of false and fraudulent pretenses, representations, and promises, namely, by submitting to VA a Settlement Statement for the 2014 calendar year in which he underreported revenue of approximately $135,863 and over-stated expenses of approximately $690,176 in a contract valued in excess of $1 million, thus defrauding the VA out of at least $771,695 in a violation of 18 U.S.C. § 1031.

# TABLE OF CONTENTS

Page

I.      BACKGROUND ...................................................................................................1

II.     PURPOSE OF AFFIDAVIT................................................................................1

III.    SUMMARY OF PROBABLE CAUSE...............................................................3

IV.     PROPERTY TO BE SEIZED ............................................................................4

V.      LEGAL AUTHORITY FOR SEIZURE.............................................................6

VI.     STATEMENT OF PROBABLE CAUSE............................................................6

        A.      Background on VA's Enhanced Sharing (Contracting) Authority...............6

        B.      Ralph TILLMAN ...............................................................................6

        C.      WESTSIDE SERVICES LIMITED LIABILITY COMPANY...................7

        D.      Richard SCOTT ................................................................................7

        E.      Fulton Management ...........................................................................7

        F.      Obtaining The Contract......................................................................8

        G.      The Contract.....................................................................................9

        H.      American Civil Liberties Union ("ACLU") Lawsuit and Civil VA/WSS
                Settlement .......................................................................................10

        I.      WSS' Annual Settlement Statements.................................................10

        J.      WSS Income Generation..................................................................12

        K.      WSS Expenses ................................................................................13

        L.      Two WSS Payments to VA Resulting in Interstate Wirings ....................13

        M.      Basis for Criminal Complaint: Submission of 2014 Settlement Statement
                Constitutes Act in Commission of Major Fraud Against the United States
                in Violation of 18 U.S.C. § 1031 ..............................................................14

VII.    FINANCIAL ANALYSIS ..................................................................................14

        A.      Summary of Financial Analysis...............................................................14

        B.      Revenue, Expense and Fraud Loss Analysis by Year...............................16

VIII.   ASSET TRACING...............................................................................................16

        A.      Summary of Asset Tracing .......................................................................16

**TABLE OF CONTENTS (Continued)**

Page

B.    MORGAN STANLEY ACCOUNT #1 Contains Fraud Proceeds Traceable to WSS Business Bank Account .................................................17

C.    MORGAN STANLEY ACCOUNT #2 Contains Fraud Proceeds Traceable to MORGAN STANLEY ACCOUNT #1 ................................19

D.    The FERRARI F40 Was Purchased with Proceeds Traceable to the Fraud Scheme..................................................................................20

E.    The SHELBY Was Purchased with Proceeds Traceable to the Fraud Scheme..................................................................................20

F.    The CORVETTE Was Purchased with Proceeds Traceable to the Fraud Scheme..................................................................................21

G.    The MCLAREN Was Purchased with Proceeds Traceable to the Fraud Scheme..................................................................................22

H.    The MB S65V Was Purchased with Proceeds Traceable to the Fraud Scheme..................................................................................23

I.    The BRONCO Was Purchased with Proceeds Traceable to the Fraud Scheme..................................................................................23

J.    The FERRARI F430 Was Purchased with Proceeds Traceable to the Fraud Scheme..................................................................................24

K.    The FERRARI CALIFORNIA Was Purchased with Proceeds Traceable to the Fraud Scheme........................................................25

L.    The TOP GUN BOAT Was Purchased with Proceeds Traceable to the Fraud Scheme..................................................................................25

M.    Other assets obtained using proceeds of the fraud.....................................27

IX.    OTHER INDICATORS OF FRAUD .................................................................30

A.    Unreported Cash Receipts...........................................................................30

X.    RALPH TILLMAN ..............................................................................................32

A.    Bribery ............................................................................................................32

B.    Ralph TILLMAN's Official Job Duties........................................................32

C.    Ralph TILLMAN Meets Richard SCOTT .................................................33

D.    Richard SCOTT Pays Ralph TILLMAN Cash Bribes to Induce TILLMAN to Omit Acts Required by His Official Duties, Thereby Allowing Fraud to be Committed Against the VA....................................................................33

ii

**TABLE OF CONTENTS (Continued)**

Page

E.  Ralph TILLMAN and Richard SCOTT's Relationship After TILLMAN Retired From the VA .................................................................36

F.  Ralph TILLMAN Engages in Recorded Conversations with SCOTT ......37

G.  Richard SCOTT Discusses Escape Plan with Ralph TILLMAN .............44

XI.  OWNERSHIP AND CONTROL OF THE PREMISES TO BE SEARCHED .....45

A.  The SCOTT RESIDENCE.........................................................................45

B.  The GARAGE............................................................................................46

C.  The BRONCO.............................................................................................47

D.  The CORVETTE ........................................................................................47

E.  The FERRARI F40 .....................................................................................47

F.  The FERRARI F430 ...................................................................................48

XII.  SUMMARY OF PROBABLE CAUSE TO BELIEVE THAT UNITED STATES CURRENCY EXISTS AT THE SCOTT RESIDENCE .......................................48

XIII.  SUMMARY OF PROBABLE CAUSE TO BELIEVE THAT RECORDS EXIST AT THE SCOTT RESIDENCE.................................................................................50

XIV.  SUMMARY OF PROBABLE CAUSE TO BELIEVE THAT VEHICLES PURCHASED WITH PROCEEDS OF THE FRAUD EXIST IN THE GARAGE.......................................................................................................53

XV.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES ...............................54

XVI.  CONCLUSION.....................................................................................................58

APPENDIX ONE:  FINANCIAL ANALYSIS BY YEAR...............................................74

A.  Revenue Analysis By Year .......................................................................74

B.  Expenses Analysis By Year .......................................................................83

C.  Total Loss to VA By Year .........................................................................86

APPENDIX TWO:  ASSET TRACING BY YEAR .........................................................93

A.  Asset Tracing By Year……………………………………………..93

**AFFIDAVIT**

I, Michael Torbic, being duly sworn, declare and state as follows:

## I.  BACKGROUND

1.     I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI"), United States Department of Justice, and have been so employed for approximately two years. I am a Certified Public Accountant ("CPA"), who prior to becoming an SA with the FBI had been employed as a Financial Analyst and Auditor for four years. I am currently a member of the FBI's public corruption squad in Los Angeles, California. The public corruption squad is responsible for conducting investigations of violations of criminal laws involving elected and non-elected public officials and major frauds committed against the United States.

2.     Since joining the FBI in January of 2016, I have received training in the investigation of violations of criminal law, such as public corruption, fraud against the government, money laundering, and financial crimes, including several hundred hours of formal training at the FBI Training Academy in Quantico, Virginia. During the time that I have been employed by the FBI, I have participated in numerous investigations relating to the corruption of public officials, bribery, money laundering, and major frauds against the United States. I have participated in many aspects of criminal investigations including the issuance of subpoenas, reviewing evidence, conducting physical and electronic surveillance, working with informants, and the execution of search and arrest warrants. Additionally, I have interviewed and/or debriefed defendants, informants, and other witnesses who had personal knowledge regarding the investigations in which I have been involved. I have also worked closely with, and learned from, other senior FBI Agents who are experienced in investigating criminal cases, conducting arrests, executing search warrants, and identifying, acquiring, and seizing evidence in criminal cases.

## II.  PURPOSE OF AFFIDAVIT

3.     This affidavit is made in support of a criminal complaint against, and arrest warrant for, Richard SCOTT ("SCOTT"), for a violation of 18 U.S.C. § 1031 (Major Fraud Against the United States), applications for seizure warrants for vehicles, a boat and brokerage accounts; and an application for a search warrant for the following locations, as described further in Attachments A-1 through A-6, which are incorporated by reference: (a) the residence of

1

SCOTT located at 201 Ocean Avenue, Santa Monica, California 90402, Unit 1209P (the "SCOTT RESIDENCE"); (b) the multi-level parking garage of the Ocean Towers condominium complex ("The GARAGE") located at 201 Ocean Avenue, Santa Monica, California 90402; (c) a green Ford Bronco located in the GARAGE ("The BRONCO"); (d) a black Chevrolet Corvette located in the GARAGE ("The CORVETTE"); (e) a black Ferrari F40 located in the GARAGE ("The FERRARI F40"); and (f) a black Ferrari F430 located in the GARAGE ("The FERRARI F430").

4.     The search warrant application seeks authorization to search the SCOTT RESIDENCE, The GARAGE, The BRONCO, The CORVETTE, The FERRARI F40, and The FERRARI F430, for evidence, fruits, or instrumentalities of violations of Bribery of Public Officials (18 U.S.C. § 201); Conspiracy to Defraud the Government With Respect to Claims (18 U.S.C. § 286); False, Fictitious, or Fraudulent Claims (18 U.S.C. § 287); Conspiracy (18 U.S.C. § 371); Theft of Government Property or Money (18 U.S.C. § 641);  False Statements (18 U.S.C. § 1001); Major Fraud Against the United States (18 U.S.C. § 1031); Mail Fraud (18 U.S.C. § 1341); Wire Fraud (18 U.S.C. § 1343); Obstruction of Criminal Investigations (18 U.S.C. § 1510); Laundering of Monetary Instruments (18 U.S.C. § 1956); Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity (18 U.S.C. § 1957); Interstate Transportation of Stolen Property (18 U.S.C. § 2314); and Sale or Receipt of Stolen Goods or Monies (18 U.S.C. § 2315), as set forth in Attachment B, which is also incorporated by reference.  As set forth in Attachment B, this warrant seeks authorization to search the GARAGE in order to locate vehicles that have been identified as purchased by proceeds of the fraud, and to identify Vehicle Identification Numbers ("VIN"), contained on or within vehicles for which the VIN is not identifiable from outside of the vehicle.  The seizure warrant applications seek authorization to seize property believed to represent proceeds of the above listed violations or property traceable to such proceeds.

5.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other law enforcement personnel assigned to this investigation, including FBI SA Brian Adkins, FBI Forensic Accountant Joan O'Dowd, Veterans Affairs ("VA") Office of Inspector General ("OIG") SA Chad Joy, and Internal Revenue Service ("IRS") Criminal Investigation SA Nick Christos ("the investigative team").  This affidavit is intended to show merely that there is sufficient probable cause for the

2

requested arrest, search, and seizure warrants and does not purport to set forth all my knowledge of the investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III.   SUMMARY OF PROBABLE CAUSE

6.   Starting in approximately 1999, SCOTT entered into a contract ("The Contract") with the VA to operate parking lots on the campuses of the VA Greater Los Angeles Healthcare System ("VA GLAHS").  By 2002, The Contract required his business, WESTSIDE SERVICES ("WSS") LIMITED LIABILITY COMPANY ("LLC"), to provide the VA with 60% of gross revenue and to report annually on revenue collected and improvements and services in lieu of revenue payments.  Based on the investigation to date, the government determined that SCOTT maintained at least two sets of financial books, one which he reported to the VA, which contained false revenue and expense statements, and a second, maintained by his bookkeeper/tax preparer, based on actual expenditures.[1]  The investigation has revealed that SCOTT underreported revenue to the VA by a minimum of $4,689,081 and over-reported expenses to the VA by a minimum of $8,219,762, which caused a direct loss to the VA of $11,397,779.  (This underreported revenue figure does not include unreported cash, potentially totaling $1 million or more from parking at the Barrington Place Lot, University of California, Los Angeles ("UCLA") baseball games, and other cash parking events.)  In addition, SCOTT began bribing the VA contracting official responsible for overseeing the contract in 2003 and continued to bribe him on a regular basis until the VA official abruptly retired in 2014 after special agents interviewed him.[2]  Following the official's retirement, SCOTT continued making payments to the former VA official in order to continue to conspire against the VA and attempt to avoid termination of The Contract.

7.   As a result of the long-running scheme to defraud the VA, SCOTT amassed considerable wealth, including three condominiums in Santa Monica, California, each of which is valued at approximately $2,500,000, numerous high-end collectible cars, including three Ferraris, a Cigarette racing boat (docked in Miami, Florida), and brokerage accounts.  Between

---

[1] We also believe SCOTT maintained cash income separate and did not report that revenue to either VA or his bookkeeper.

[2] The VA official retired knowing he was under investigation.

3

2003 and 2016, SCOTT also utilized WSS business bank accounts to pay for approximately
$740,000 in travel, $413,000 in meals and entertainment, SCOTT's salary of $3.1 million, and
countless personal expenses and owner's draws.[3]  The travel and meal/entertainment expenses
are especially suspicious because the business of WSS consisted of overseeing parking lots at the
VA GLAHS, only two of which were regularly staffed, which did not require any travel beyond
the few mile area roughly bounded by Ohio Avenue to the South, Sunset Boulevard to the North,
San Vicente to the West and Sepulveda Boulevard to the East.

8.      The VA contracting official began cooperating with the government in mid-May
2017, was interviewed multiple times, and agreed to record his conversations with SCOTT.
Among other things, the contracting official admitted to the bribery scheme, that he knew
SCOTT was underreporting revenue and inflating expenses reported to the VA, that SCOTT
liked contractors that paid him in cash, and frequently waited for cash parking events so that he
could use the proceeds of that cash to pay the official.  The contracting official also admitted to
law enforcement that prior to first meeting with the government in May 2017, he told SCOTT he
was meeting with the government for a "reverse proffer."  In surreptitiously recorded
conversations later in May 2017, among other things, SCOTT told the official that he (the
official) never should have deposited cash (from the bribes) in his bank account, questioned how
law enforcement knew "that it came from me,?" and remarked that it was "Fucking seventy
grand.  All this drama for seventy grand."  Later, after the official told SCOTT he might
cooperate with the government, SCOTT complained that "you told me a hundred times, you
weren't going to . . . rat out on me," and "[i]f they only got you for one hundred thousand bucks
what's the, that's nothing."

## IV.    PROPERTY TO BE SEIZED

9.      This affidavit is made in support of applications for seizure warrants for the
following property:

### BROKERAGE ACCOUNTS

---

[3] SCOTT also owned a multi-million dollar home on Pacific Coast Highway in Malibu
from 2004 to 2013.  (For 2003 and 2004, alone, SCOTT underreported approximately $1.9
million revenue to VA, not including un-reported cash.)  Our financial analysis determined that
at least a portion of the down payment and mortgage payments were paid with proceeds of the
scheme to defraud the VA.

     a.      All funds and securities on deposit in the Morgan Stanley Choice Select Asset Account, most recently numbered 241 038680 005, in the name of SCOTT ("MORGAN STANLEY ACCOUNT #1"); and

     b.      All funds and securities on deposit in the Morgan Stanley Choice Select Retirement Account, most recently numbered 241 039001 005, in the name of SCOTT ("MORGAN STANLEY ACCOUNT #2").

**VEHICLES**

     c.      One 1991 Ferrari F40 2 Door Coupe, VIN ZFFMN34A2M0087589 ("The FERRARI F40");

     d.      One 2010 Ford Shelby CT600 Super Snake, VIN 1ZVBP8KS6A5153369 ("The SHELBY");

     e.      One 1969 Chevrolet Corvette, VIN 194679S719392 ("The CORVETTE");

     f.      One 2005 Mercedes-Benz SLR McLaren, VIN WDDAJ76F25M000304 ("The MCLAREN");

     g.      One 2015 Mercedes-Benz S65V, VIN WDDUG7KB1FA100976 ("The MB S65V");

     h.      One 1973 Ford Bronco, VIN U15GLQ66867 ("The BRONCO");

     i.      One 2005 Ferrari F430, VIN ZFFEW58AX50141441 ("The FERRARI F430"); and

     j.      One 2013 Ferrari California, VIN ZFF65TJA6E0195924 ("The FERRARI CALIFORNIA").

**BOAT**

     k.      One 2009 Cigarette Racing Team 38 foot Top Gun Boat (Hull Identification Number (HIN CRTUST05L809) ("The TOP GUN BOAT").

    10.    I submit there is probable cause to believe that SCOTT, WSS, Ralph TILLMAN ("TILLMAN"), VA contracting official, and others known and unknown conspired to engage in: Bribery of Public Officials (18 U.S.C. § 201); Conspiracy to Defraud the Government With Respect to Claims (18 U.S.C. § 286); False, Fictitious, or Fraudulent Claims (18 U.S.C. § 287); Conspiracy (18 U.S.C. § 371); Theft of Government Property or Money (18 U.S.C. § 641); False Statements (18 U.S.C. § 1001); Major Fraud Against the United States (18 U.S.C. § 1031); Mail Fraud (18 U.S.C. § 1341); Wire Fraud (18 U.S.C. § 1343); Obstruction of Criminal

Investigations (18 U.S.C. § 1510); Laundering of Monetary Instruments (18 U.S.C. § 1956); Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity (18 U.S.C. § 1957); Interstate Transportation of Stolen Property (18 U.S.C. § 2314); and Sale or Receipt of Stolen Goods or Monies (18 U.S.C. § 2315).[4]  I further submit there is probable cause to believe that the property identified in paragraph 9 was obtained, in whole or in part, with proceeds traceable to the commission of the aforementioned unlawful acts, and/or that the listed assets were involved in one or more violations of 18 U.S.C. § 1956 or 18 U.S.C. § 1957.

## V.    LEGAL AUTHORITY FOR SEIZURE

11.    This affidavit is submitted in support of applications for warrants to seize the above-listed property because probable cause exists to believe that the foregoing assets are subject to seizure pursuant to 18 U.S.C. § 981(b) and forfeiture by the United States pursuant to 18 U.S.C. § 981(a)(1)(A) and (C) because those funds constitute or are derived from proceeds traceable to the criminal violations, listed in paragraph 10, and/or were involved in one or more violations of 18 U.S.C. § 1956 or 18 U.S.C. § 1957.

## VI.    STATEMENT OF PROBABLE CAUSE

### A.    Background on VA's Enhanced Sharing (Contracting) Authority

12.    Public Law 104-262 § 301, codified under Title 38 U.S.C. § 8153, authorized VA to enter into "sharing" agreement contracts with other entities for the use of underutilized VA space.  Further, the law authorized VA to retain the proceeds of the transactions.  VHA Directive 97-015, Enhanced Health Care Resources Sharing Authority, implemented Public Law 104-262 and required that contracts "must be in the best interest of veterans" and "must be in the best interest of the government."

### B.    Ralph TILLMAN

13.    According to TILLMAN's personnel file, TILLMAN served approximately three years with the United States Army and received an honorable discharge in 1977.  VA appointed TILLMAN as a Clerk-Typist on May 7, 1978.  Later, TILLMAN became a Purchasing Agent and then a Contract Specialist.  On October 24, 1986, VA promoted TILLMAN to a Supervisory Contract Specialist, Chief of Acquisition Management Services.  Effective December 31, 2000,

---

[4] We are also investigating violations of Subscribing to a False Tax Return (26 U.S.C. § 7206(1)).

VA transferred TILLMAN from VA Long Beach, CA to VA GLAHS, Office of Director, and his title became Contract Specialist. On April 17, 2005, VA converted TILLMAN from a Contract Specialist to a Marketing Manager, Chief of Asset Management. On September 18, 2014, TILLMAN retired from VA as a GS-14, earning $130,530 annually.

## C.   WESTSIDE SERVICES LIMITED LIABILITY COMPANY

14.     On October 25, 1999, DG filed articles of organization with the California Secretary of State for WSS, documenting the formation of WSS as a limited liability company that had more than one manager and was involved in land management and transportation. In a letter dated August 31, 2000, DG stated he sold all interests in WSS LLC to SCOTT. On April 16, 2003, August 5, 2013, and August 7, 2015, SCOTT filed or caused to be filed a record with the California Secretary of State, documenting SCOTT was the sole manager of WSS LLC.

15.     Based upon witness interviews and financial analysis, we have determined SCOTT owned and operated WSS as a for-profit business that provided parking services on VA property only.

## D.   Richard SCOTT

16.     Based upon witness interviews, tax returns, financial analysis, and other records we have determined SCOTT, born in September 1959, also known as David Richard SCOTT and Richard JANOVITZ, is married to RS. SCOTT filed his taxes with a single status in 2004, but married filing jointly status in 2005 and thereafter.

## E.   Fulton Management

17.     Fulton Management ("FM"), formerly known as Fulton & Meyer ("F&M"), provided business management, tax services, and accounting services to clients.

18.     In July 2016, VA OIG agents interviewed EF. EF owned and operated FM and was an Enrolled Agent.[5] SCOTT had been a client of EF for approximately 20 years. FM performed bookkeeping, payroll, and tax preparation services for SCOTT and WSS. EF said that when SCOTT's mother passed away, he became SCOTT's partner in WSS in order to keep it from becoming a single-member LLC.

---

[5] QuickBooks is the Accounting software used by FM to manage their client's financial records and prepare financial reports.

19.     ER told us that she joined F&M in July 2001 and took over WSS' account in 2003 or 2004. ER became a business manager and partner at F&M, and later became the only partner with EF, as a 10 percent owner of FM. ER provided after-the-fact accounting services to WSS by entering two bank accounts and a credit card account into QuickBooks.[6] ER also processed WSS' payroll and issued paper checks. ER provided SCOTT with QuickBooks reports a couple of times each year, which often included annual profit and loss statements.

20.     ER was confident that the work she performed for WSS, specifically the information reflected in QuickBooks, was accurate and reliable. QuickBooks was supported by bank statements, checks, deposit slips, and credit card statements that were all reconciled. ER noted that there may have been typos and mistakes, but the overarching numbers and information included in QuickBooks was accurate, since ER personally received and reconciled the statements. In an effort to not slow down the process of reconciling and entering items into QuickBooks, if ER was unable to identify how to categorize a specific item she would enter it as 'miscellaneous' and make an effort to clarify those items with the client before tax returns were prepared. If an item was classified to a specific category then ER was confident that the entry was in fact accurate.

21.     ER verified that after SCOTT's mother passed away approximately five to ten years ago, EF became a one percent owner of WSS, but did not share in any profits. EF prepared the tax returns for WSS and SCOTT. SCOTT paid FM typically in cash, somewhere between $8,000 and $20,000 annually.

**F.     Obtaining The Contract**

22.     On or about February 11, 1999, WSS submitted a proposal stating WSS was the parent company of Malibu Parking, Scott-Westside Limousine, and Minuteman Parking Company. WSS was comprised of three partners: SCOTT, DG, and CF. On or about May 21, 1999, WSS submitted an amended proposal. On June 18, 1999, TILLMAN requested and received authorization to award The Contract to WSS.

---

[6] An enrolled agent is a person who has earned the privilege of representing taxpayers before the Internal Revenue Service by either passing a three-part comprehensive IRS test covering individual and business tax returns, or through experience as a former IRS employee. Enrolled agent status is the highest credential the IRS awards. Individuals who obtain this elite status must adhere to ethical standards (www.irs.gov; last accessed October 14, 2017).

### G.    The Contract

23.    By August 1, 1999, a VA official, DG, and SCOTT signed The Contract. The Contract required $7,500 monthly rent, supplemented by a share of gross revenue to VA.

24.    On March 3, 2000, a VA official and DG signed Modification #1, which allowed WSS to retain the first $75 in gross revenue for parking in lot 15, used for UCLA baseball games, and 60% of gross revenue above $75 paid to VA. All other areas would have "50/50 revenue sharing after documented expenses." WSS would provide annual reconciliation reports. (A type of reconciliation of revenue and services or improvements provided to the VA.) The period of performance was April 1, 2000 to March 31, 2010, with one ten year option.

25.    On January 19, 2001, TILLMAN and SCOTT signed a modification of The Contract, which stated that effective March 1, 2001, WSS would begin managing the VA parking lot known as the Barrington Place Lot ("Barrington Place Lot") with WSS receiving 20 percent of profit and VA receiving 80 percent of profit after deduction of bona fide operating expenses.

26.    On July 15, 2002, TILLMAN and SCOTT signed a new contract[7] between WSS and VA, commencing July 15, 2002 and expiring July 14, 2012. The Contract required 60 percent of all gross revenue be paid to VA and WSS was responsible for all expenses, which would be deducted from WSS' 40 percent share. Payments and reconciliation reports would be submitted quarterly, unless otherwise directed by the Contracting Officer.

27.    On July 22, 2002, TILLMAN and SCOTT signed Modification #1, which provided that WSS would provide parking management services on an as needed basis, which included improvements to parking areas within VA GLAHS, and consulting and construction services related to the operation and management of parking at VA GLAHS. WSS agreed to provide annual reconciliation reports.

28.    In a Memorandum for Record, dated April 20, 2005, TILLMAN documented WSS provided improvements and services in lieu of revenue to the VA beginning in October 2003. The Memorandum was approved by VA GLAHS' Director.

---

[7] This new contract was the core contract in place for the duration of The Contract and covered all "control and operation of vehicular parking areas within the [VA GLAHS] for revenue generation."

29.     On or about May 25, 2011, TILLMAN signed a letter addressed to SCOTT advising him that effective immediately, VA GLAHS renewed WSS' contract through July 14, 2022.

**H.     American Civil Liberties Union ("ACLU") Lawsuit and Civil VA/WSS Settlement**

30.     In 2011, the ACLU filed a lawsuit against the VA entitled, <u>Valentini et. al v. Eric Shinseki</u>, CV 11-04846-SJO-MRW, which, among other things, challenged the VA's use of its West Los Angeles campus for any purposes not specifically related to care and housing of veterans. As a result of this lawsuit, VA contracting officials needed to terminate a variety of contracts with outside vendors, including with WSS, which TILLMAN had extended to 2022. In January 2017, the VA and WSS entered into a civil settlement to resolve financial matters and terminate The Contract. However, since the civil settlement was occurring during the pendency of the present criminal investigation of SCOTT and WSS, the settlement agreement specifically excluded from the VA release any funds owed by WSS for "fraud or willful misconduct." The parties also stipulated that the settlement agreement did not apply to any tax case, civil fraud case, or any other criminal liability. (Even apart from the exclusions, the government was not aware of the full extent of the fraud committed by SCOTT/WSS and did not have conclusive evidence that SCOTT had bribed TILLMAN until four months after the civil settlement.)

**I.     WSS' Annual Settlement Statements**

31.     SCOTT provided the VA with an annual accounting called a "Settlement Statement," which was a-one page document. The Contract and modification required these annual statements, which documented WSS' gross revenue, VA's 60 percent portion, and any VA improvements.[8] Below is a summary of WSS' alleged gross revenue as reported to the VA:

---

[8] "Improvements" could have also included consulting and construction services, based on contract modification #1, dated July 22, 2002.

**WSS Settlement Statement Gross Revenue**

| Customer | 2003-2016 |
|---|---|
| Northern Trust Golf | $372,010.00 |
| VCI Construction | $199,000.00 |
| So Cal Gas Co. | $1,797,379.70 |
| Quicksilver Towing | $210,000.00 |
| Barrington Lot Income | $3,622,751.27 |
| Barrington Pl[9] | $617,136.35 |
| Kiewit Construction | $947,781.00 |
| Buerge Ford | $905,227.54 |
| Buerge Chrysler/Jeep | $222,200.00 |
| Santa Monica Auto Group | $121,750.00 |
| Santa Monica Infinity | $18,500.00 |
| Tumbleweed | $3,357,539.02 |
| UCLA[10] | $4,581,496.13 |
| Getty | $1,154,470.00 |
| Enterprise Rent-A-Car | $1,210,047.56 |
| Nissan Golf | $325,000.00 |
| Walker Burgue (sic) | $106,000.00 |
| Motorcycle Academy | $32,725.00 |
| Misc. Film and Other Parking | $1,443,195.00 |
| **Total Gross Revenue** | **$21,244,208.57** |

---

[9] We believe "Barrington Pl" and "Barrington Lot Income" represent the same revenue source, however, SCOTT used one term for some years and the other for the remaining years.

[10] This represents a contract between WSS and UCLA for parking. It does not include revenue for UCLA baseball games.

32.     Based on WSS' reported total gross revenue, VA was entitled to 60 percent of the money, $12,746,525. Between 2003 and 2016, WSS claimed to have made VA improvements totaling $11,651,032. Based on the revenue figures provided by SCOTT, VA should have received $1,095,493. Instead, VA received no payments until after 2013 because WSS consistently claimed to have expended more than WSS owed VA.[11] For the calendar year 2013, WSS paid VA $20,603. For calendar year 2014, WSS paid VA $174,093. WSS failed to provide VA with Settlement Statements for calendar years 2015 and 2016 until VA reached the civil termination agreement, dated January 19, 2017, as referenced above in paragraph 30.[12] In 2017, WSS paid VA $75,000 for calendar year 2015 and $75,000 for calendar year 2016, and submitted the 2015 and 2016 annual Settlement Statements.

**J.     WSS Income Generation**

33.     Based on The Contract between WSS and VA, VA should have received 60 percent of gross revenue. The 60 percent of gross revenue owed to VA could be paid in the form of check or improvements and services in lieu of revenue, as directed by the contracting officer (TILLMAN).

34.     WSS had a variety of revenue-generating business, all operated on VA property. WSS ran VA's parking lot on South Barrington Place, the Barrington Place Lot in Brentwood. The lot has a parking attendant booth where a WSS employee collected cash or check payments.[13] Customers and employees of a shopping center nearby and others paid to park their vehicles in this lot.

35.     For many years, WSS collected parking revenue for events held on or near the VA, including events at VA's Brentwood and Wadsworth theaters, UCLA baseball games, Nissan and Northern Trust golf tournaments, Los Angeles Marathon, and numerous other events.

36.     WSS also generated revenue from other businesses who wanted to rent space to park vehicles, leave equipment, or store supplies on VA lots, including construction companies,

---

[11] WSS made other payments to VA throughout the years, however, the payments represented reimbursements for VA Police Services and other expenses payable to VA.

[12] WSS made one other payment to VA on or about December 16, 2016, after being presented with evidence of unreported UCLA parking for several years (unrelated to UCLA baseball revenue). Please see footnote 42 in Appendix One.

[13] For approximately the past two or three years, WSS accepted credit card payments.

car dealerships, rental car agencies, UCLA, a bus company, and others. In addition, WSS received money from film companies to park their vehicles or stage equipment.

**K.     WSS Expenses**

37.     Based on The Contract and Modification #1, WSS' expenses associated with revenue-generating business must be deducted from WSS' 40 percent share of gross revenue. However, expenses associated with a VA Contracting Officer-approved (TILLMAN) services or improvements to VA that did not generate revenue should be deducted from VA's 60 percent share of gross revenue.

38.     Between 2003 and 2012, WSS claimed improvements to VA on the annual Settlement Statements that consistently exceeded what WSS owed to VA. Examples of WSS' alleged improvements included: VA parking services, special event staffing, parking lot maintenance and repairs, fencing, aerial survey and report, miscellaneous supplies, BP[14] booth computer equipment, VA consulting fee, equipment rental, and specific parking lot designs and remodels.

**L.     Two WSS Payments to VA Resulting in Interstate Wirings**

39.     On December 3, 2014, WSS issued a check to VA for $20,603.24 along with a two-page 2013 Settlement Statement. On February 20, 2015, VA agent cashier in Los Angeles, CA scanned the check and deposited the item with Debit Gateway Over the Counter Network ("DG-OTCnet")[15] in Cleveland, OH. The Federal Reserve Bank ("FRB") of Cleveland processed this check in the E-Gov Unit.

40.     On January 22, 2016, WSS issued a check to VA for $174,093.24 along with a cover letter and two-page 2014 Settlement Statement. On April 29, 2016, VA agent cashier in Los Angeles, CA scanned the check and deposited the item with DG-OTCnet in Cleveland, OH as the bank of first deposit. DG-OTCnet, Cleveland, OH transmitted the item electronically to

---

[14] Agents understand this refers to the Barrington Place Lot.
[15] The U.S. Treasury Department utilizes the DG for centralized processing and settlement of electronic checks and Automated Clearing House debit transactions received from Revenue Collections Management channels – Electronic Check Processing, OTCnet, and Pay.gov– and directly from four agencies (www.fiscal.treasury.gov; last accessed October 31, 2017).

FRB Atlanta, GA via FRB processing server site in Dallas, TX on April 29, 2016. FRB Atlanta, GA transmitted the electronic item via FRB processing site in Dallas, TX to City National Bank ("CNB"), Los Angeles, CA on May 2, 2016.

**M.   Basis for Criminal Complaint: Submission of 2014 Settlement Statement Constitutes Act in Commission of Major Fraud Against the United States in Violation of 18 U.S.C. § 1031**

41.   There is probable cause to believe that in connection with procurements of property and services, SCOTT knowingly executed and attempted to execute a scheme with the intent to defraud the United States and to obtain money and property by means of false and fraudulent pretenses, representations and promises in procurement of property and services as a contractor with the United States where the value of such contract was at least $1,000,000. More specifically, as set forth in paragraphs 13, 30, and 45 in Appendix One, referenced below, on or about January 29, 2016, SCOTT submitted to VA the Settlement Statement for the 2014 calendar year, which he was required to submit under the contract, in which he underreported revenue by $135,863.46 and over-stated expenses by $690,176.94 in a contract valued in excess of $1 million,[16] thus defrauding the VA out of at least $771,695.02, not including unreported cash revenue, and resulting in a violation of 18 U.S.C. § 1031.

**VII.   FINANCIAL ANALYSIS**

**A.   Summary of Financial Analysis**

42.   Members of the investigative team obtained and analyzed WSS' bank accounts,[17] QuickBooks records, including electronic QuickBooks obtained from FM, and Settlement Statements. Based on our analysis of income that was deposited into the two WSS' bank accounts and comparison to Settlement Statements SCOTT provided to VA,[18] we identified that WSS actual gross revenue between 2003 and 2016 was $25,933,289.72, not the $21,244,208.57

---

[16] According to the legislative history of § 1031 and case law, the "value of the contract" refers to the value of the contract awarded or the amount the government has agreed to pay whether or not this amount represents profit to the company. S.Rep.No. 100-503, at 12 (1988), reprinted in 1988 U.S.C.C.A.N. 5969, 5975-76. Here, the value of the WSS contract exceeds $1 million because WSS received gross revenue over $20 million, and in any given year, typically received well over $1 million in gross revenue.

[17] Due to bank record retention policies, we were only able to obtain and review WSS' bank records back to 2007.

[18] We used WSS' QuickBooks records and customer records when necessary to supplement bank records.

reported to VA. (As stated previously, what we call "actual" gross revenue is likely understated because it does not capture the cash receipts SCOTT regularly retained and failed to report to both his bookkeeper and VA.) Since WSS was contractually obligated to provide 60 percent of gross revenue to VA, the amount owed to VA for these years was $15,559,973.83, which could be paid in check or in-kind services/improvements.

43.     According to the Settlement Statements between 2003 and 2016, in-kind services/improvements to VA parking lots allegedly totaled $11,651,032.15. Based on our analysis of WSS' QuickBooks for the period January 1, 2003 through December 31, 2016, WSS' total ordinary expenses were $14,290,499.42.[19] Consequently, WSS reported to VA that all but $2,639,467.27 of their ordinary expenses were in-kind services/improvements for VA. Upon completing our analysis of WSS' QuickBooks, as detailed in Appendix One, we determined WSS over-reported expenses by $8,219,762.46[20] and actual in-kind services/improvements SCOTT provided to VA only totaled $3,431,269.69.

44.     The Contract between WSS and VA stated VA was entitled to 60 percent of the actual gross revenue for these years, which we determined to be $15,559,973.83. This amount was owed to VA in the form of check or in-kind services/improvements. From 2003 to 2016, we determined actual in-kind services/improvements WSS provided in lieu of revenue totaled

---

[19] Ordinary expenses for WSS include all expenditures entered into QuickBooks (transactions from WSS bank statements and credit card statements) with the exception of expenditures for state taxes and one miscellaneous contribution of $2,000 in 2013. These ordinary expense categories in WSS' QuickBooks included SCOTT's salary (approximately $3,192,000.00), personal travel (approximately $740,000.00), professional fees including attorney expenses (approximately $416,000.00), meals and entertainment (approximately $413,000.00), utilities (approximately $252,000.00), and personal rent (approximately $247,000.00).

[20] We determined which ordinary expenses in WSS' QuickBooks could be considered in-kind services/improvements to the VA. Determination was based on interviews with TILLMAN, current and former WSS employees, and ER, FM after-the-fact Accountant for WSS, as well as pertinent WSS customer records. Out of an abundance of caution and a conservative calculation of misrepresentation of in-kind services/improvements, expenses that could possibly be classified as in-kind services/improvements were accounted for as such. Additionally, in order to capture the payroll related expenses of employees providing non-revenue generating services to the benefit of VA, we included 50% of salary expense, payroll taxes expense, and workers compensation expense in their analysis. These non-revenue generating services included providing parking attendants for occasional VA events and providing parking attendants for the main patient parking lot in order to ensure unauthorized individuals were not parking in the lot. We compared these legitimate in-kind services/improvements in WSS' QuickBooks with the Settlement Statements provided by WSS and calculated the annual overstatement of in-kind services/improvements by WSS.

$3,431,269.69. Total payments that were made by SCOTT as settlement payments to VA totaled $730,924.88 for the 2003 to 2016 Settlement Statements.[21] Therefore, as a result of the underreported revenue and over-stated in-kind services/improvements, reported by SCOTT on the 2003 to 2016 Settlement Statements, the total loss to VA is $11,397,779.26. (This loss figure does not include unreported cash, potentially totaling $1 million or more from parking at the Barrington Place Lot, UCLA baseball games, and other cash parking events.)

## B.   Revenue, Expense and Fraud Loss Analysis by Year

45.   A detailed, year-by-year analysis of the revenue, expenses and fraud loss is set forth in Appendix One, attached hereto. The analysis was based upon comparison of Settlement Statements SCOTT submitted to VA, WSS' QuickBooks, WSS customer records, and WSS' bank and financial records. We calculated the actual revenue that WSS earned each year primarily from CNB and Wells Fargo records, and the 60 percent that WSS owed to the VA. We then credited SCOTT with a conservative calculation of in-kind services/improvements that WSS may have provided to the VA during the year, and any settlement payments that SCOTT made to VA. The difference between the actual revenue and the in-kind services/improvements and settlement payments provided us with a conservative total loss to the VA for each year. Our figures did not include unreported cash, potentially totaling $1 million or more from parking at the Barrington Place Lot, UCLA baseball games, and other cash parking events, as a physical record was not generated as a result of these transactions.

## VIII.   ASSET TRACING

## A.   Summary of Asset Tracing

46.   For a detailed analysis of asset tracing by bank account and by year, please refer to Appendix Two.

47.   Members of the investigative team have identified five bank accounts that SCOTT used between 2003 and 2016 to accumulate proceeds of the fraud, which were then used to purchase the assets described in detail below. The five accounts were CNB account ending in 7279 ("WSS 7279"), CNB account ending in 5203 ("WSS 5203"), Wells Fargo account ending in 5540 ("WSS 5540"), Wells Fargo account ending in 3502 ("WSS 3502"), and Wells Fargo

---

[21] WSS made one payment of $386,228.40 to VA on or about December 16, 2016, after being presented with evidence of unreported UCLA parking for several years (unrelated to UCLA baseball revenue). Please see footnote 42 in Appendix One.

account ending in 4853 ("WSS 4853"). The entirety of the actual revenue earned by WSS and described above in paragraph 42 was deposited into these five bank accounts. (As stated previously, what we call "actual" gross revenue is likely understated because it does not capture the cash receipts SCOTT regularly retained and failed to report to both his bookkeeper and the VA.) Per The Contract, the VA was entitled to 60 percent of the actual revenue that was deposited in WSS 7279, WSS 5203, WSS 5540, WSS 3502, and WSS 4853.

48.    The 60 percent of actual revenue that was owed to the VA could be paid in the form of check or in-kind services/improvements in lieu of revenue. As described above in paragraphs 43 and 44, the conservative in-kind services/improvements and monetary payments that SCOTT provided to the VA between 2003 and 2016, which were funded by these five WSS bank accounts, were $3,431,269.69 and $730,924.88, respectively. By under reporting revenue and inflating in-kind services/improvements on the Settlement Statements that SCOTT provided the VA, SCOTT caused, at a minimum, a direct loss to the VA of $11,397,779.26.

49.    SCOTT accumulated the proceeds of the fraud in WSS 7279, WSS 5203, WSS 5540, WSS 3502, and WSS 4853. As described above, SCOTT was depositing WSS revenue into these five accounts. When SCOTT did provide in-kind service/improvements or settlement payments to the VA, they were funded by the revenue that was deposited in these five accounts. However, by not remitting the proper share of actual revenue to the VA, SCOTT was accumulating 100 percent of the fraud proceeds within these five accounts.

**B.    MORGAN STANLEY ACCOUNT #1 Contains Fraud Proceeds Traceable to WSS Business Bank Account**

50.    Based on the financial analysis we performed and the evidence set forth below, I believe there is probable cause that MORGAN STANLEY ACCOUNT #1 was funded with proceeds of the fraud.

51.    See paragraphs 3, 5 and 6 in Appendix Two for detailed asset tracing by year.

52.    According to records received from Morgan Stanley, MORGAN STANLEY ACCOUNT #1 is held in the name of SCOTT and was opened on or about September 21, 2000. The account is believed to contain both funds and securities. The balance as of January 1, 2003 was $492,221.36.

53.    According to the WSS' QuickBooks, check #1196, drawn on WSS 5203 in the amount of $135,000.00, was written to Morgan Stanley on or about November 24, 2003.

According to records received from Morgan Stanley, a deposit in the amount of $135,000.00 was made to MORGAN STANLEY ACCOUNT #1 that cleared on or about November 26, 2003.

54.     According to the WSS' QuickBooks, check #2566, drawn on WSS 7279 in the amount of $1,200,000.00 was written to Morgan Stanley on or about November 12, 2004. According to records received from Morgan Stanley, a deposit in the amount of $1,200,000.00 was made to MORGAN STANLEY ACCOUNT #1 that cleared on or about November 15, 2004. This $1,200,000.00 deposit constituted the largest source of funding into MORGAN STANLEY ACCOUNT #1 and, as of July 31, 2017, there were no additional deposits into this account after this deposit.

55.     While not all of the monies collected by WSS over the duration of The Contract were fraudulently collected, the fraud, including the underreporting of receipts and over-reporting of allowances, permeated the contractual relationship between WSS and the VA. Pursuant to U.S.C § 983(a)(2)(B), the proceeds of the fraud scheme described herein included "the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services." Direct costs do not include any part of the violator's overhead expenses or income taxes paid, and the claimant bears the burden of proving the amount of any such direct costs. The scope and extent of the fraud committed by WSS renders all of the deposits into MORGAN STANLEY ACCOUNT #1 subject to seizure (if not forfeiture).

56.     At the end of November 2004, the equity value of MORGAN STANLEY ACCOUNT #1 was $1,972,209.85, all of which represented or was traceable to monies collected by WSS pursuant to The Contract. Of that amount, at least $994,255.69 should have been paid to the VA, but was fraudulently withheld.[22] In other words, while all of the money was traceable to the fraud scheme, the lesser amount represented actual fraud proceeds, and made up 50.4 percent of the total equity. As of July 31, 2017, the total equity value of MORGAN STANELY ACCOUNT #1 was $1,787,630.84, of which the VA should have received at least $900,965.94. Moreover, as explained below, a total of $395,491.16 of the funds in MORGAN STANLEY

---

[22] Refer to paragraphs 3 and 6 in Appendix Two for detailed asset tracing by year. This amount was comprised of a $135,000 transfer from WSS 5203 in 2003, and $859,255.69 of the $1,200,000 transfer from WSS 7279 in 2004.

ACCOUNT #1 were used to fund or acquire other assets that the government seeks to seize.[23] Should the court conclude that the government is not entitled to seize the entirety of the funds and securities, the seizure should not be less than 50.4 percent of the current equity value.

57.     Funds from MORGAN STANLEY ACCOUNT #1 were used to purchase the following assets in whole or in part: The FERRARI F40, The SHELBY, The MCLAREN and The FERRARI CALIFORNIA and to partially fund MORGAN STANLEY ACCOUNT #2.

## C.   MORGAN STANLEY ACCOUNT #2 Contains Fraud Proceeds Traceable to MORGAN STANLEY ACCOUNT #1

58.     Based on the financial analysis we performed and the evidence set forth below, I believe there is probable cause that MORGAN STANLEY ACCOUNT #2 was funded with proceeds of the fraud.

59.     See paragraphs 7 in Appendix Two for detailed asset tracing by year.

60.     According to records received from Morgan Stanley, MORGAN STANLEY ACCOUNT #2 is a Simplified Employee Pension Individual Retirement Account in the name of SCOTT and was opened on or about April 10, 2003.

61.     The account received two transfers from MORGAN STANLEY ACCOUNT #1 totaling $80,000.00. On or about April 15, 2004 a transfer in the amount of $40,000.00 was made. On or about November 17, 2004, a second transfer in the amount of $40,000.00 was made. There were also two other $40,000.00 deposits made to MORGAN STANLEY ACCOUNT #2, one on April 11, 2003 and one on November 17, 2005; details of these deposits were not provided.[24] There have not been any additional deposits into this account since the $40,000.00 deposit on November 17, 2005. The investigation has not revealed any other likely sources of these deposits other than proceeds of the fraud scheme.

62.     The account balance of MORGAN STANLEY ACCOUNT #2 as of July 31, 2017 was $104,313.37.

---

[23] Total payments made from MORGAN STANLEY ACCOUNT #1, that were used to fund and/or pay for MORGAN STANLEY ACCOUNT #2, The FERRARI F40, The SHELBY, The MCLAREN, and The FERRARI CALIFORNIA were $438,700.00. This figure represents payments in which interest and principal were included for loans on several of the assets. Total payments to these assets without interest (principal and funding of MORGAN STANLEY ACCOUNT #2 only) were $395,491.16.

[24] According to records received from Morgan Stanley, "Employer Contributions" totaled $120,000.00 since inception and "Employee Deferral Contributions" totaled $40,000.00 since inception, as of July 31, 2017.

**D.     The FERRARI F40 Was Purchased with Proceeds Traceable to the Fraud Scheme**

63.     Based on the financial analysis we performed and the evidence set forth below, I believe there is probable cause that The FERRARI F40 was purchased with proceeds of the fraud.  (See paragraphs 53-54 and 63 in Appendix Two for detailed asset tracing by year.)

64.     On or about June 28, 2017, government agents surveilled the parking garage of SCOTT's residence.  Located in parking space 570 was a black Ferrari F40 with a rear license plate, which read "Ferrari of Beverly Hills 310-275-4400."  The Ferrari F40 appeared to closely resemble pictures of 1991 Ferrari F40 2 Door Coupes found via open source internet database searches, and records from Barrett-Jackson Auction Company LLC ("Barrett-Jackson").

65.     According to Barrett-Jackson records, SCOTT purchased a 1991 Ferrari F40 2 Door Coupe, VIN ZFFMN34A2M0087589 on or about January 17, 2015, at an auction held in Scottsdale, AZ.  According to records obtained from Woodside Credit, check #1273, drawn on CNB account number ending 6612 for SCOTT ("SCOTT 6612"), in the amount of $214,395.00 and payable to Woodside Credit was submitted for down payment on the vehicle.  The funds in SCOTT 6612 at the time the check cleared on or about January 22, 2015 consisted of $80,000.00 from MORGAN STANLEY ACCOUNT #1 and $130,000.00 directly or indirectly from WSS 7279 through pervasive comingling of business and personal funds.

66.     According to records obtained from Barrett-Jackson, payment to Barrett-Jackson for the Ferrari F40 was made via wire transfer, Fed/SWIFT confirmation number 0120MMQFMPBC000016, from Woodside Credit for $643,500.00 on or about January 20, 2015.

67.     According to records obtained from Woodside Credit, on or about January 22, 2015 Woodside Credit sold the loan for The FERRARI F40 to Bank of the Pacific.

68.     According to records obtained from Bank of the Pacific, 21 checks drawn on MORGAN STANLEY ACCOUNT #1 totaling $103,700.00, including $60,868.16 toward the principal, were paid to Bank of the Pacific between February 2015 and December 2016.

69.     According to Bank of the Pacific records, the balance on the loan was $408,898.72 as of July 24, 2017.

**E.     The SHELBY Was Purchased with Proceeds Traceable to the Fraud Scheme**

70.     Based on the financial analysis we performed and the evidence set forth below, I believe there is probable cause that The SHELBY was purchased with proceeds of the fraud.

71.    See paragraphs 40, 47, and 55 in Appendix Two for detailed asset tracing by year.

72.    On or about June 28, 2017, government agents surveilled the parking garage of SCOTT's residence. Located in parking space 674 was a black colored Shelby Cobra, bearing VIN 1ZVBP8KS6A5153369, which was witnessed in plain view. The Shelby Cobra appeared to closely resemble pictures of 2010 Ford Shelby Cobra CT600 Super Snakes found via open source internet database searches, and records from Barrett-Jackson.

73.    According to records obtained from Barrett-Jackson, SCOTT purchased a 2010 Ford Shelby CT600 Super Snake, VIN 1ZVBP8KS6A5153369 on or about January 20, 2013, at an auction held in Scottsdale, AZ. According to records obtained from Woodside Credit, check #5990, drawn on WSS 7279, in the amount of $22,000.00, and payable to Woodside Credit was submitted for down payment on the vehicle. According to records obtained from Barrett-Jackson, payment to Barrett-Jackson for the 2010 Ford Shelby CT600 Super Snake was made via wire transfer, Fed/SWIFT confirmation number 0122MMQFMPBC000048, from Woodside Credit for $110,000.00 on or about January 22, 2013.

74.    According to records obtained from Woodside Credit, on or about February 13, 2013 Woodside Credit sold the loan for The SHELBY to Bank of the Pacific.

75.    According to records obtained from the Bank of the Pacific, 13 checks drawn on WSS 7279 totaling $14,000.00, including $6,976.52 toward the principal, were paid on the loan for this vehicle between May 2013 and January 2015.

76.    According to records obtained from Bank of the Pacific, check #1184, drawn on MORGAN STANLEY ACCOUNT #1, in the amount of $20,000.00, including $19,623.00 toward the principal, was paid as a final payment on the loan for this vehicle on or about June 27, 2017.

**F.    The CORVETTE Was Purchased with Proceeds Traceable to the Fraud Scheme**

77.    Based on the financial analysis we performed and the evidence set forth below, I believe there is probable cause that The CORVETTE was purchased with proceeds of the fraud.

78.    See paragraphs 28, 33, 41, 48, and 56 in Appendix Two for detailed asset tracing by year.

79.    On or about June 28, 2017, government agents surveilled the parking garage of SCOTT's residence. Located in parking space 535A was a black Chevrolet Corvette that was covered with a brown car cover, bearing a black license plate with "L88" written in yellow

letters.[25]  The Chevrolet Corvette appeared to closely resemble pictures of 1969 L88 Chevrolet Corvettes found via open source internet database searches.

80.     According to records obtained from First Entertainment Credit Union ("FECU"), SCOTT purchased a Black 1969 L88 Chevrolet Corvette, VIN 194679S719392 and financed it through FECU with a loan date of April 19, 2011.

81.     According to records obtained from FECU, between June 2011 and June 2015, 48 payments totaling $214,590.00 were made to FECU from checks drawn on WSS 7279 and applied to this vehicle loan.  Of this total amount, $195,089.71 was applied to the principal.  The majority of checks paid from WSS 7279 to FECU for vehicle loans included payments to multiple vehicle loans.

## G.     The MCLAREN Was Purchased with Proceeds Traceable to the Fraud Scheme

82.     Based on the financial analysis we performed and the evidence set forth below, I believe there is probable cause that The MCLAREN was purchased with proceeds of the fraud.

83.     See paragraphs 64 in Appendix Two for detailed asset tracing by year.

84.     On or about June 28, 2017, government agents surveilled the parking garage of SCOTT's residence.  Located in parking space 672A was a black Mercedes-Benz SLR McLaren with a rear license plate that read, "Penske-Wynn," and bearing VIN WDDAJ76F25M000304, which was witnessed in plain view.  The Mercedes-Benz SLR McLaren appeared to closely resemble pictures of Mercedes-Benz SLR McLarens found via open source internet database searches.

85.     According to records obtained from First Republic Bank, First Republic Bank Cashier's Check #2907062, payable to C.M.A. in the amount of $175,000.00 was purchased with funds withdrawn from SCOTT's First Republic Bank account number ending 8754 ("FRB Personal 8754") and cleared on or about February 24, 2016.  The Reference on the Cashier's Check was "Mercedes SLR."

86.     According to records obtained from First Republic Bank on August 21, 2017, a deposit totaling $170,000.00 and comprised of two checks was made to FRB Personal 8754 on or about February 16, 2016.  The first check in the deposit was check #1158 drawn on MORGAN STANLEY ACCOUNT #1, in the amount of $150,000.00 and payable to SCOTT.

---

[25] Without the agents instructing him to do so, VN, Doorman at Ocean Towers, removed the rear portion of the car cover, which revealed California license plate number "L88."

The second check in the deposit was check #156, identified by TD Ameritrade account number ending 0484, drawn on brokerage account number ending 3394 for SCOTT and RS, in the amount of $20,000.00 and payable to SCOTT.

**H.    The MB S65V Was Purchased with Proceeds Traceable to the Fraud Scheme**

87.    Based on the financial analysis we performed and the evidence set forth below, I believe there is probable cause that The MB S65V was purchased with proceeds of the fraud.

88.    See paragraphs 49, 58, and 65 in Appendix Two for detailed asset tracing by year.

89.    On or about October 20, 2017, government agents surveilled the parking garage of SCOTT's residence. Located in parking space 535 was a black Mercedes-Benz S65 with a rear license plate that read, "bhbenz.com," and bearing VIN WDDUG7KB1FA100976, which was witnessed in plain view. The Mercedes-Benz S65 appeared to closely resemble pictures of Mercedes-Benz S65s found via open source internet database searches.

90.    According to records obtained from Mercedes-Benz of Orange Park, SCOTT purchased a 2015 Mercedes-Benz S65V, VIN WDDUG7KB1FA100976, on or about April 5, 2014 for a total sales price of $230,215.07. SCOTT used his American Express credit card ending in 5004 ("AMEX 5004") for the $2,000 down payment on April 17, 2014. Upon taking receipt of the vehicle on or about July 30, 2014, SCOTT paid the remaining balance via a $21,215.07 charge to AMEX 5004 and a $207,000.00 cashier's check from FECU. AMEX 5004 was paid with checks and Automated Clearing House payments from WSS 7279.

91.    According to records obtained from FECU, the Credit Union originated a loan in the amount of $207,000.00 to SCOTT on or about July 29, 2014 for a 2015 Mercedes-Benz S65V, VIN WDDUG7KB1FA100976.

92.    According to records obtained from FECU, between September 2014 and May 2016, 16 payments totaling $42,384.00.00 were made to FECU from checks drawn on WSS 7279 and applied to this vehicle loan. Of this amount, $35,193.40 was applied to the principal. The majority of checks paid from WSS 7279 to FECU for vehicle loans included payments to multiple vehicle loans.

**I.    The BRONCO Was Purchased with Proceeds Traceable to the Fraud Scheme**

93.    Based on the financial analysis we performed and the evidence set forth below, I believe there is probable cause that The BRONCO was purchased with proceeds of the fraud.

94.    See paragraphs 57 in Appendix Two for detailed asset tracing by year.

95.     On or about June 28, 2017, government agents surveilled the parking garage of SCOTT's residence.  Located in parking space 425 was a green, convertible Ford Bronco with a rear license plate, which read "Hendrick Motor Sports."  The Ford Bronco appeared to closely resemble pictures of 1973 Ford Broncos found via open source internet database searches.

96.     According to records obtained from Mecum Auction, SCOTT purchased a 1973 Ford Bronco, VIN U15GLQ66867, on or about September 22, 2015.  SCOTT paid $29,235.00 via check #1387, drawn on SCOTT 6612.  The balance in the account prior to the check clearing on or about September 23, 2015 was $3,115.64.  When the check cleared, it created a negative balance.  Three other checks totaling $5,216.33 payable to two other payees, also cleared on or about September 23, 2015 and September 24, 2015.  On or about September 25, 2015 a $40,000.00 transfer was made from WSS 7279 to SCOTT 6612, covering the negative balance created by the purchase of the vehicle and bringing the balance in SCOTT 6612 to $8,664.31.

**J.     The FERRARI F430 Was Purchased with Proceeds Traceable to the Fraud Scheme**

97.     Based on the financial analysis we performed and the evidence set forth below, I believe there is probable cause that The FERRARI F430 was purchased with proceeds of the fraud.

98.     See paragraphs 11 in Appendix Two for detailed asset tracing by year.

99.     On or about June 28, 2017, government agents surveilled the parking garage of SCOTT's residence.  Located in parking space 570A was a black Ferrari, with a rear license plate, which read "Ferrari of Beverly Hills 310-275-4400."  The Ferrari appeared to closely resemble pictures of 2005 Ferrari F430 CPEs found via open source internet database searches.

100.    According to records obtained from Ferrari of Beverly Hills.  SCOTT purchased a 2005 Ferrari F430 CPE, VIN ZFFEW58AX50141441, on or about April 29, 2005, for $206,000.00.  Also contained in the records received from Ferrari of Beverly Hills were multiple records indicating that various types of services had been performed on a 2005 Ferrari F430 Coupe bearing the same VIN as referenced above, from 2005 until 2013, at Ferrari of Beverly Hills.

101.    According to the WSS' QuickBooks, check #2812 drawn on WSS 7279 and in the amount of $206,000.00, was payable to "Ferrari of Beverly Hills" and cleared on or about April 28, 2005.

**K.     The FERRARI CALIFORNIA Was Purchased with Proceeds Traceable to the Fraud Scheme**

102.    Based on the financial analysis we performed and the evidence set forth below, I believe there is probable cause that The FERRARI CALIFORNIA was purchased with proceeds of the fraud.

103.    See paragraph 44 in Appendix Two for detailed asset tracing by year.

104.    On or about June 28, 2017, government agents surveilled the parking garage of SCOTT's residence.  Located in parking space 423 was a white Ferrari, with a rear license plate, which read "Ferrari of Beverly Hills 310-275-4400," and bearing VIN ZFF65TJA6E0195924, which was in plain view.

105.    According to records obtained from Ferrari of Beverly Hills, which also included California Department of Motor Vehicle (DMV) records, SCOTT purchased a 2014 Ferrari California 2+2 DCT, VIN ZFF65TJA6E0195924 on or about August 13, 2013, for $234,000, from Ferrari of Beverly Hills.  According to the records, SCOTT used AMEX 5004 for the $20,000 down payment.  AMEX 5004 was paid with checks and Automated Clearing House payments from WSS 7279.

106.    The remaining balance was financed through TD Auto Finance with a monthly payment of $3,530 for a period of 72 months.  TD Auto Finance did not provide detailed payment records for any transactions before August 2017, which would identify the method in which SCOTT was making payments on the loan.  However, included in the documents that were provided was a $5,000.00 check drawn on MORGAN STANLEY ACCOUNT #1 with a date of August 1, 2017.

**L.     The TOP GUN BOAT Was Purchased with Proceeds Traceable to the Fraud Scheme**

107.    Based on the financial analysis we performed and the evidence set forth below, I believe there is probable cause that The TOP GUN BOAT was purchased with proceeds of the fraud.  (See paragraphs 8-9, 12-26, 29-31, 34-37, 39, 42, and 45 in Appendix Two for detailed asset tracing by year.)

108.    According to records obtained from Lip-Ship Performance SCOTT purchased a 38-foot Top Gun boat on August 12, 2013 for $265,550.00 including sales tax, title, and registration.  SCOTT paid for the boat via personal check on August 12, 2013 drawn on SCOTT 0714 for $25,000.00 and an electronic wire transfer from SCOTT 0714 on September 05, 2013

for $240,550.00.  The HIN for the boat is CRTUST05L809 and the Florida registration number is FL2390PP.

109.    The boat is currently docked in North Miami, Florida.  Pursuant to Federal Rule of Criminal Procedure 41(b)(5) and 18 U.S.C. § 981(b)(3), at the request of a federal law enforcement officer or an attorney for the government a magistrate judge having authority in any district where activities related to the crime may have occurred may issue a warrant for property located outside the jurisdiction of any state or district.

110.    According to analysis performed on records obtained from Wells Fargo, deposits to SCOTT 0714 between March 7, 2013 and September 5, 2013 included two checks and two wires totaling $60,000.00 from AM and NM, believed to be rental income from a real property located at 27543 Pacific Coast Highway, Malibu, CA 90265 ("Malibu House").

111.    Deposits also include six checks totaling $42,000.00 from CB.  Three checks include the memo, "Rent-201 Ocean 804B."  According to records obtained from BST Escrow, SCOTT purchased the property located at 201 Ocean Avenue #804B, Santa Monica, California 90402 ("804B") for $520,000.00 with a closing date of July 1, 2003.  According to records obtained from Morgan Stanley, check #503, in the amount of $50,000.00 and drawn on MORGAN STANLEY ACCOUNT #1 was payable to "BST Escrow" and cleared on or about March 3, 2003.  According to records obtained from NCB, SCOTT financed $416,000.00 through NCB for this property.  There were over 100 checks drawn on WSS 7279 and payable to NCB between 2007 and 2016.

112.    Deposits also include a wire transfer in the amount of $450,000.00 on or about June 19, 2013 from CE.  During an interview, CE informed agents that the payment was for most of the furnishings located within the Malibu House, which was purchased from SCOTT and RS on or about July 3, 2013.  CE was unable to provide a list of items included in the out-of-escrow furniture sale.  According to records obtained from American Express, at least $68,000.00 was charged to American Express 5004 in the name of SCOTT for furniture purchases between February 2004 and July 2013, the time frame in which SCOTT was the owner of the Malibu House.  AMEX 5004 was frequently paid with checks and ACH payments from WSS 7279.  According to WSS' QuickBooks, AMEX 5004 appeared to function as the business credit card for WSS.  In addition, SCOTT's only source of income during the time he owned, and presumably furnished, the Malibu House was from WSS.

113.    The investigative team has determined that that proceeds of the fraud were likely used to fund all or part of the down payment as well as some of the mortgage payments for the Malibu House.  SCOTT purchased the Malibu House in the first quarter of 2004 for an undisclosed amount via Chicago Title Company and Malibu Escrow.  According to the WSS' QuickBooks, check #1258, drawn on WSS 5203 and in the amount of $117,000.00 was payable to Malibu Escrow and cleared on or about January 14, 2004.  According to records obtained from FECU, checks drawn on WSS 7279 were used to make mortgage payments on a $3 million mortgage held by FECU during the time that SCOTT owned the Malibu House.

114.    Deposits into SCOTT 0714 on or about the time The TOP GUN BOAT was purchased were comprised primarily of rents from the Malibu House, rents from 804B, and a payment from CE outside of escrow for the purchase of furniture in the Malibu House.  Proceeds of the fraud can be traced to the purchase of and mortgage payments on these residences, as well as $68,000.00 of furniture that was purchased during the time SCOTT owned the Malibu House. I believe that based on the amount of fraud proceeds that were involved in these deposits into SCOTT 0714 there is probable cause to believe that The TOP GUN BOAT was also purchased with proceeds of the fraud.

**M.    Other assets obtained using proceeds of the fraud.**

### *Stock Certificates for 804B*

115.    Based on the financial analysis we performed and the evidence set forth below, I believe there is probable cause that 804B was purchased in part or in whole with proceeds of the fraud.

116.    See paragraphs 16, 19, 22, 25, 29, 34, 42, 50, 59, 66 in Appendix Two for detailed asset tracing by year.

117.    SCOTT was party to an Assignment of Proprietary Lease dated June 25, 2003 (as the Assignee) between RB (Assignor), SCOTT, and Ocean Towers Housing Corporation regarding unit 804B and appurtenant garage space in the Ocean Towers Apartments located at 201 Ocean Avenue, Santa Monica, California.

118.    According to records obtained from NCB, this property was purchased by SCOTT on or about July 1, 2003.  According to records obtained from Morgan Stanley, check #503, drawn on MORGAN STANLEY ACCOUNT #1, in the amount of $50,000.00 and payable to

27

BST Escrow, cleared on or about March 3, 2003. We believe this payment constituted part or the entire down payment.   The balance of $416,000.00 was financed through NCB.

119.   According to analysis performed on records obtained from CNB for account WSS 7279, 112 checks payable to NCB totaling $282,850.00 cleared between April 16, 2007 and September 06, 2016. According to records obtained from NCB, the balance on the mortgage as of July 26, 2017 was $230,854.68.

### *Stock Certificates for 1209P*

120.   Based on the financial analysis we performed and the evidence set forth below, I believe there is probable cause that 1209P was purchased in part or in whole with proceeds of the fraud.

121.   See paragraphs 61 in Appendix Two for detailed asset tracing by year.

122.   According to records obtained from First Republic Bank, SCOTT and RS entered into a Cooperative Apartment Rider to Leasehold Deed of Trust with First Republic Bank on March 16, 2015 for the property consisting of an apartment and a stock ownership interest in the cooperative apartment corporation known as Ocean Towers Housing Corporation. The property was described as 201 Ocean Avenue #1209P, Santa Monica, CA 90402. The principal amount of this loan was $1,485,000.00 and the terms of the note included interest-only payments every month during the first ten years of the loan.

123.   SCOTT was party to an Assignment of Proprietary Lease dated March 9, 2015 (as the Assignee) between MWS (Assignor), SCOTT, and Ocean Towers Housing Corporation regarding unit 1209P and appurtenant garage space in the Ocean Towers Apartments located at 201 Ocean Avenue, Santa Monica, California.

124.   According to records obtained from BST Escrow, the contract sales price was $2,475,000.00 and the down payment was $1,009,000.00. According to records obtained from CNB, check #1276, drawn on account number ending 6612 for SCOTT ("SCOTT 6612") and in the amount of $72,000.00, was payable to BST Escrow and cleared on February 6, 2015. The memo on the check was "013-211450; 201 Ocean 1209P."

125.   According to records obtained from CNB, check #142 from TD Ameritrade account number ending 0784 and drawn on TD Ameritrade investment account number ending 3394 ("TD 3394") in the amount of $70,000.00 was deposited to SCOTT 6612 on or about February 5, 2015. According to records obtained from CNB, there was a wire transfer in the

28

amount of $937,000.00 from SCOTT 6612 to account number ending 1450 for BST Escrow, Inc. on April 1, 2015. The Originator to Beneficiary information was "Escrow #34468."

126.    According to records obtained from CNB, a $900,000.00 deposit was made to SCOTT 6612 on or about March 31, 2015 consisting of two checks. The first was check #171 drawn on TD 3394 in the amount of $700,000.00. The check was dated March 31, 2015 and included the memo, "1209P." The second was a check from Morgan Stanley account number ending 9338 and drawn on MORGAN STANLEY ACCOUNT #1 in the amount of $200,000.00.

127.    Proceeds of the sale of the property at 27543 Pacific Coast Highway, Malibu, California 90265 ("Malibu House") on or about July 3, 2013, represented by a $1,375,671.69 wire transfer from Malibu Escrow to TD 3394, were used for the down payment for 1209P via rapid movement of funds from TD 3394 to SCOTT 6612 to BST Escrow. TD 3394 was originally opened as an individual account held by RS on or about October 9, 2003. According to an Account Modification Form for the account obtained from TD Ameritrade, SCOTT was added as a Co-Owner with the account type designated as Joint Tenants with Rights of Survivorship. RS signed the Form and dated it June 26, 2013.

128.    Proceeds of the fraud were used to fund all or part of the down payment as well as some of the mortgage payments for the Malibu House. We believe that SCOTT purchased the Malibu House in the first quarter of 2004 for an undisclosed amount via Chicago Title Company and Malibu Escrow. (Malibu Escrow no longer has the records.) According to the WSS QuickBooks, check #1258, drawn on CNB account number ending 5203 for WSS ("WSS 5203") and in the amount of $117,000.00 was payable to Malibu Escrow and cleared on or about January 14, 2004. According to records obtained from FECU, checks drawn on CNB account number ending 7279 for WSS ("WSS 7279") were used to make mortgage payments on a $3 million mortgage held by FECU during the time that SCOTT owned the Malibu House.

### *Stock Certificates for 1404P*

129.    Based on the financial analysis we performed and the evidence set forth below, I believe there is probable cause that 1404P was purchased in part or in whole with proceeds of the fraud.

130.    See paragraphs 35, 43, 51, 60, 67 in Appendix Two for detailed asset tracing by year.

131.    According to records obtained from PNC Bank, SCOTT and RS obtained a new conventional loan from PNC Bank in the amount of $731,250.00 for 1404P. Included with these records were additional escrow instructions from West Coast Escrow indicating the total purchase price was $990,000.00 and the down payment was $198,000.00, of which $28,950.00 had been deposited in escrow as of July 9, 2012.

132.    According to records obtained from PNC Bank, there were 38 payments totaling $73,500.00 from WSS 7279 toward the PNC Bank mortgage between October 1, 2012 and November 30, 2016, including $9,887.05 toward the principal.

## IX.    OTHER INDICATORS OF FRAUD

### A.    Unreported Cash Receipts

133.    The investigative team analyzed all cash deposits between 2007 and 2016 to WSS bank accounts[26] and only identified $234,520 in cash deposits, which based upon the investigation, appears to be a small percentage of cash collected by WSS.

134.    WSS normally used Minuteman Parking Company for large revenue generating events, like Wadsworth or Brentwood theater events. We obtained and analyzed Minuteman Parking Company invoices to WSS and some contained information revealing vehicle counts, number of parking passes, and revenue collected. Between 2004 and 2014, revenue was approximately $1.1 million. Based on the event data listed on the invoices, we know that the only VA Settlement Statement category in which this income could be shown was in "Miscellaneous Film and Other Parking." Each of the years between 2005 and 2012, revenue listed on Minuteman Parking Company invoices exceeded the total that year in "Miscellaneous Film and Other Parking" category reported on the Settlement Statements SCOTT provided to VA. This underreporting of revenue in cash or checks was approximately $477,000.

135.    We interviewed AS, Manager at WSS under SCOTT, who has been employed with WSS since 2004. Part of AS's responsibilities included overseeing the Barrington Place Lot. AS or other WSS employees hand delivered the revenue generated by this lot and other cash-generating events directly to SCOTT at his home or another meeting location. AS estimated he delivered approximately $1,300 per week in cash from Barrington Place Lot income

---

[26] Earlier bank records were no longer available.

to SCOTT.[27]  In 2017, the Barrington Place Lot contained at least three signs that read, "Parking Fees Help Assist Programs That Benefit U.S. Veterans."  One additional sign on the parking lot attendant booth read, "U.S. Department of Veterans Affairs – PROCEEDS GO TOWARD HELPING VETERANS IN NEED."

136.   AS estimated UCLA baseball parking generated approximately $300 during small games and $1,000-$2,000 during larger games.  Based on that information, if each of the approximately 465 home games[28] between 2003 and 2016 only averaged $500 per game, the estimated revenue generation would be approximately $232,500.  If each game averaged $1,000 for the same time period, the estimated revenue generation would be approximately $465,000.

137.   TILLMAN stated, during an interview on or about May 16, 2017, SCOTT had informed him that SCOTT received cash that he did not report in the 2004 Settlement Statement to VA.  TILLMAN also said that SCOTT charged Brentwood schools for parking in the Barrington Place Lot.  According to TILMAN, SCOTT also did not report income from construction and subcontractor parking in Lot 29.  TILLMAN believed many construction companies paid SCOTT in cash, and at some point SCOTT told TILLMAN, "I like cash contractors."

138.   TILLMAN noted, during an interview on or about June 1, 2017, that he did not believe that SCOTT ever reported the UCLA baseball revenue to VA.  SCOTT told TILLMAN that it was "good money."  SCOTT told TILLMAN that when he received his UCLA money, he could give TILLMAN his [bribe] money.  TILLMAN stated this was also the case with VA's Wadsworth Theater.  According to TILLMAN, SCOTT obtained most of his smaller and short-term parking lot clients himself, who often paid SCOTT cash.  TILLMAN stated that there were also many cash sources that SCOTT did not report to VA like the Los Angeles Marathon.[29]

139.   On June 22, 2017, we interviewed TILLMAN, who said UCLA baseball parking was all cash revenue for every home game.  TILLMAN stated that the VA Wadsworth and Brentwood Theaters used WSS for parking services between approximately 2003 and 2012.

---

[27] $1,300 per week multiplied by 52 weeks multiplied by 14 years (2003-2016) totals $946,400.

[28] UCLA baseball have averaged 33.2 home games each season between 2003 and 2016 (www.uclabruins.com; last accessed October 30, 2017).

[29] We are aware that WSS deposited five LA Marathon LLC checks totaling $27,371 between 2011 and 2015.

TILLMAN said all those theater events involved cash parking and TILLMAN knew this from conversations with SCOTT. TILLMAN stated that the Barrington Place Lot generated cash for SCOTT and that many monthly parkers paid a lot of "good cash."

140.    On July 21, 2017, we interviewed TILLMAN, who told us that on multiple occasions when TILLMAN asked SCOTT to meet with him in order to get cash [bribes] from him, SCOTT would say that he needed to "wait for parking," "wait for UCLA," "wait for cash," "wait for Wadsworth," or wait for another particular event that involved cash.

## X.    **RALPH TILLMAN**

### A.    **Bribery**

141.    We obtained and reviewed TILLMAN's 2008 to 2016 bank records and found approximately $143,747 in cash deposits.[30] The largest cash deposit was $7,000 and the ten largest deposits totaled $32,300. We interviewed TILLMAN on multiple occasions in 2017 and based on TILLMAN's estimations, we believe TILLMAN received approximately $286,250 in bribes and hush money between 2003 and 2017 from SCOTT in return for TILLMAN conspiring with SCOTT to defraud VA.

### B.    **Ralph TILLMAN's Official Job Duties**

142.    TILLMAN[31] was employed as a Contracting Officer for the VA in 1999, and was therefore considered to be an employee acting for, or on behalf, of a department of the United States government.

143.    TILLMAN's job responsibilities within his official capacity as a Contracting Officer at all times discussed herein included, but were not limited to, managing alternative contracts, including VA share agreements. As part of his official duties in managing share

---

[30] Earlier bank records were no longer available.

[31] TILLMAN's criminal history includes a conviction for Driving Under the Influence on or about February 8, 1979. TILLMAN agreed to cooperate with the federal government on or about May 16, 2017, and was subsequently interviewed by federal agents, on multiple occasions, pursuant to a proffer agreement between TILLMAN and the United States Attorney's Office for the Central District of California. TILLMAN admitted to committing multiple federal crimes including accepting bribes and actions, which I believe would constitute tax crimes. TILLMAN also admitted to conduct that violated VA policy related to the appropriate use of VA computers. After TILLMAN began to cooperate with the federal government, I believe there were moments during his multiple proffer sessions where he lied to federal agents and omitted material facts he knew to be relevant to the investigation, including that SCOTT continued to pay him after he retired from the VA in September 2014. TILLMAN amended these misstatements and recounted these material omissions in later interviews and proffers.

agreements for the VA, TILLMAN was responsible for reviewing Settlement Statements, which were required by the share agreement contracts with the VA. WSS was required to submit annual Settlement Statements to the VA per WSS' share agreement contract with the VA and TILLMAN was responsible for reviewing said Settlement Statements. As the Contracting Officer, TILLMAN was also responsible for determining what in-kind services/improvements WSS could perform for VA.

## C.   Ralph TILLMAN Meets Richard SCOTT

144.   TILLMAN met SCOTT in or about 2001 or 2002, shortly after WSS had entered into a share agreement contract with the VA in 1999. TILLMAN was involved in re-negotiating WSS' original contract for award in 2002. TILLMAN said that SCOTT had performed well during the first two years of WSS' contract with the VA, and because of that performance, the VA entered into a new contract with WSS in 2002.

145.   Shortly after TILLMAN met SCOTT, SCOTT told TILLMAN that if he (TILLMAN) ever needed anything, to let him (SCOTT) know. TILLMAN and SCOTT were not friends, nor did they meet socially.

## D.   Richard SCOTT Pays Ralph TILLMAN Cash Bribes to Induce TILLMAN to Omit Acts Required by His Official Duties, Thereby Allowing Fraud to be Committed Against the VA

146.   Shortly after meeting SCOTT, TILLMAN received a call about a family matter. TILLMAN needed several thousand dollars. TILLMAN called SCOTT and asked SCOTT if he would be willing to provide TILLMAN the money. SCOTT agreed.

147.   On or about November 10, 2003, SCOTT visited TILLMAN in his (TILLMAN's) office and gave TILLMAN a FedEx envelope containing $6,000 in 100-dollar bills. TILLMAN told SCOTT that he would pay SCOTT back, but SCOTT told TILLMAN that he did not need to pay back the money. SCOTT asked TILLMAN if he was okay with the arrangement, and although TILLMAN felt guilty, he accepted.

148.   After the $6,000 payment, between November 2003 and May 2004, SCOTT gave TILLMAN a few hundred dollars approximately three to four times. TILLMAN did not solicit these payments from SCOTT. Furthermore, TILLMAN could not recall any other instances in which he solicited money from SCOTT after his initial solicitation for which he received $6,000. Thereafter, TILLMAN and SCOTT rarely discussed the subject of money.

149.    Approximately one to two years after SCOTT gave TILLMAN the initial $6,000 payment, SCOTT began a regular pattern of paying TILLMAN cash approximately once a month. The cash was always hand delivered, by SCOTT, to TILLMAN at TILLMAN's office. The cash, which ranged from $500 to $1,000 each time, and on a few occasions, reached as high as $4,000, was always delivered in a sealed FedEx envelope containing 100-dollar bill denominations. In instances where the cash payments reached $1,000, ten 100-dollar bills were stapled together. SCOTT would generally place the envelope on TILLMAN's desk without further discussion. Sometimes TILLMAN would thank SCOTT for the money, and tell SCOTT that the money was really helping him out.

150.    On a few occasions, TILLMAN and SCOTT met at a restaurant in the Brentwood area of Los Angeles where SCOTT gave TILLMAN the FedEx envelope containing the monthly cash payment.

151.    SCOTT's payments to TILLMAN continued, uninterrupted, in this manner until TILLMAN retired from the VA in September 2014.[32]

152.    SCOTT was required, per WSS' contract with the VA, to submit annual Settlement Statements to the VA. Most years WSS mailed the Settlement Statements to the VA contracting office or directly to TILLMAN's office. SCOTT dropped off the Settlement Statements, in person, to TILLMAN's office on a couple of occasions. TILLMAN was primarily responsible for reviewing the Settlement Statements provided by SCOTT and WSS.

153.    SCOTT was required to submit WSS' annual Settlement Statements to the VA during the first quarter of the subsequent year, which was summarized by the submitted Settlement Statement. However, SCOTT's submittal of the annual Settlement Statements were always approximately six months late, but backdated by SCOTT to appear that the Settlement Statement had been submitted on time.

154.    SCOTT did not explicitly ask TILLMAN to do anything in particular, but TILLMAN believed he and SCOTT had an understanding where TILLMAN was expected to

---

[32] TILLMAN was interviewed by VA OIG agents on or about September 16, 2014 regarding TILLMAN's and SCOTT's conduct described herein. Immediately after the interview, TILLMAN retired from the VA. In May 2017, TILLMAN admitted he retired as a matter of self-preservation because he was concerned that if the VA had uncovered his conduct, he would not be allowed to retire in a manner that would allow him to salvage his pension.

look the other way when confronted with Settlement Statements he knew to be false, and that were also submitted months late, because SCOTT was paying him cash every month.

155.    TILLMAN did not specifically tell SCOTT that he was looking the other way, but he did tell SCOTT that he did not care what was contained in the Settlement Statements, just that the Settlement Statements be consistent from one to another.  Furthermore, TILLMAN told SCOTT that the Settlement Statements were a requirement of VA's contract with WSS, but that nobody but TILLMAN would review them.

156.    On a couple occasions, TILLMAN noticed that the Settlement Statements did not balance, so TILLMAN instructed SCOTT to correct them and make them balance, which SCOTT did.  TILLMAN told SCOTT that SCOTT did not need to provide supporting documentation for WSS' Settlement Statements.  TILLMAN believed SCOTT fabricated the numbers contained on the WSS Settlement Statements.

157.    TILLMAN and SCOTT never used the terms "bribe," "kickback," or "payment" in discussions with each other, however, during a proffer interview conducted with TILLMAN on May 16, 2017, TILLMAN stated, "He [SCOTT] was definitely bribing me and I was definitely looking the other way."

158.    TILLMAN stated that he knew SCOTT was inflating expenses and underreporting revenue on the WSS Settlement Statements sent to the VA.  TILLMAN was given an opportunity to review several Settlement Statements during one of his subsequent interviews.  Upon review of the Settlement Statements, TILLMAN pointed out several items on the Settlement Statements that he recalled to be false.  Some examples included, but were not limited to, the following:

        a.      The expense amount ($329,225) identified for the Lot 42 redesign and remodel line item found on the 2004 Settlement Statement seemed high because the job did not require a complete tear down of the lot, only a repair and restriping of the lot.

        b.      The income amount ($29,000) identified for the "Miscellaneous Film and Other Parking" line item found on the 2003 Settlement Statement appeared low.  Furthermore, TILLMAN recalled SCOTT telling him that he received a lot more income than he actually reported to the VA.

c.     In reference to the 2004 Settlement Statement, SCOTT told TILLMAN that he received cash parking revenue that he did not report on the Settlement Statement he submitted to the VA.

### E.     Ralph TILLMAN and Richard SCOTT's Relationship After TILLMAN Retired From the VA

159.    TILLMAN resigned from the VA on or about September 16, 2014, after he was initially contacted by federal agents regarding The Contract between VA and WSS (See Footnote 32 above). A few days later, TILLMAN called SCOTT to inform SCOTT that he had resigned from the VA after federal agents contacted him and asked questions about The Contract. SCOTT asked TILLMAN if the agents had asked about him (SCOTT).[33]

160.    TILLMAN has been assisting SCOTT, as a consultant, in WSS' termination process with the VA since he (TILLMAN) left the VA in September 2014. TILLMAN said that he was trying to help SCOTT get the best deal that he could from the VA because he felt beholden to SCOTT after SCOTT had paid him cash in the manner that he had for the past several years.[34]

161.    During a proffer of TILLMAN conducted on May 16, 2017, TILLMAN told the interviewing agents that he had not been compensated, by SCOTT, since he left the VA in September 2014, nor did he expect to be compensated for his assistance in helping SCOTT with the WSS/VA contract termination.

162.    However, on May 23, 2017, TILLMAN acknowledged receiving $200-$500 per month, from SCOTT, since retiring from the VA.

163.    TILLMAN's candor was called into question by interviewing agents in the May 16, 2017 proffer interview. TILLMAN explained that he would tell himself that the monthly

_____

[33] On September 16, 2014, VA OIG agents interviewed TILLMAN. TILLMAN stated he was comfortable with WSS' Settlement Statements because they had been consistent over the years. TILLMAN told agents he felt the value VA received from WSS was sufficient. TILLMAN denied receiving money, favors, gifts, or anything of value from SCOTT. TILLMAN also denied fabricating any records. TILLMAN claimed his unexplained cash deposits in his bank accounts were from him a variety of things and that he made a lot of money and saved money. TILLMAN reiterated he did not take anything from WSS and that he was truthful to the interviewing agents. Based on our review of the evidence and TILLMAN's later statements, we believe these initial statements on September 16, 2014 to be false, which TILLMAN made to conceal his illegal conduct.

[34] Based on this information, we believe TILLMAN violated post-government employment regulations regarding conflicts of interest.

payments (post-retirement) were in return for legitimate consulting services he had provided to SCOTT in order to justify the payments in his (TILLMAN's) own mind. However, TILLMAN acknowledged that he, "know[s] what it is" and that the payments were, "his [SCOTT's] way of paying me" in order to "keep me happy." TILLMAN further classified the payments as bribes or hush money.

164.    TILLMAN stated that he, "wasn't telling the whole truth" in reference to his candor during the May 16, 2017 proffer interview.

165.    TILLMAN explained that approximately 90% of the time, the post-retirement payments he received from SCOTT occurred in TILLMAN's vehicle after he and SCOTT ate at a pre-determined location for lunch. After finishing lunch, TILLMAN and SCOTT would walk to TILLMAN's vehicle, enter the vehicle, TILLMAN would open the center console, and SCOTT would place the cash inside.

166.    During a proffer of TILLMAN conducted on June 1, 2017, TILLMAN admitted to federal agents that he had been receiving cash from SCOTT, on a monthly basis, consistent with what he previously admitted to, described above.

167.    Since TILLMAN's retirement, SCOTT has told TILLMAN that, "if I [SCOTT] go down, you [TILLMAN] go down." SCOTT further told TILLMAN that unless one of them cooperates with law enforcement, the government had nothing. TILLMAN told SCOTT in advance, he was having a "reverse proffer" meeting on May 9, 2017 with federal agents. SCOTT later informed TILLMAN that he had a picture of one of the government participants walking out of the building after the meeting.

## F.    Ralph TILLMAN Engages in Recorded Conversations with SCOTT

168.    Subsequent to TILLMAN's cooperation with the federal government, TILLMAN engaged in multiple recorded conversations with SCOTT, both in person and over the phone.[35]

---

[35] Descriptions of recorded conversations are summaries based on my review of the recordings, understanding of the context of the recorded conversations, knowledge of this case, and my training and experience. The descriptions are not based on a final, verbatim transcript, and at times, I have included draft excerpts transcribed by myself. I have placed my understanding of what is being said in brackets within the quotes. Since this affidavit is offered for a limited purpose, I have not included a description of every topic discussed or every statement contained in the recorded conversations.

169.    On May 17, 2017, at approximately 3:37PM, TILLMAN called SCOTT and recorded the telephone conversation using the FBI's iTacc system.[36]  During the telephone call the following exchange took place:

> RT[37]:    I did have the thought today, I mean…I should have never deposited that cash, what a fucking idiot.
>
> RS[38]:    Told you a hundred times, I told you, and I told you, and I told you, make sure you're not depositing this.
>
> RT:    Yeah, yep.  So I'm kind of, you know, I'm kind of losing it right now.
>
> RS:    [Over talk] Besides, what proof, what, what, even if, even if, even if you did come and, and, and what do they, what proof do they have?  How do they, how do they know that it came, that it came from me?

170.    Based on my training and experience, and knowledge of this investigation, I believe the "cash" referenced by TILLMAN during this exchange is the cash paid to TILLMAN by SCOTT in the manner outlined above.  Furthermore, I believe this exchange illustrates SCOTT's consciousness of guilt because SCOTT appears to be aware that depositing cash would create a traceable money trail, which could uncover his and TILLMAN's bribery and fraud scheme.

171.    A short time later during the same recorded telephone call, TILLMAN and SCOTT had the following exchange:

> RS:    I don't want you, I think you should tell him [TILLMAN's attorney] 'F' you.  I think you should see what they have, I think you should make them take a shot.  I mean, it's bullshit.  Fucking seventy grand.  All this drama for seventy grand.

172.    Based on my training and experience, and knowledge of this investigation, I believe that the "seventy grand" mentioned by SCOTT is a reference to the cash bribes SCOTT used to pay TILLMAN on a monthly basis as outlined herein.

---

[36] The FBI's iTacc system allows the consenting party to call into a central switchboard to place outgoing phone calls that are consensually recorded and later reviewed by the FBI.  I have reviewed all phone calls referenced herein that utilized the iTacc system.

[37] "RT" refers to Ralph TILLMAN

[38] "RS" refers to Richard SCOTT

173.    On May 18, 2017, at approximately 1:43PM, TILLMAN placed a recorded telephone call to SCOTT using the FBI's iTacc system.  During the telephone call, TILLMAN explained to SCOTT that TILLMAN's attorney wanted him (TILLMAN) to cooperate with the investigation into SCOTT's fraud against the VA.  SCOTT replied, "Well I think we should get together and have a convo.  Talk about it, because I did give it a lot of thought last night but I don't know if we, we want to have this convo right now on the phone.  You never know."

174.    Based on my training and experience, and knowledge of this investigation, I believe SCOTT did not want to have the conversation over the phone because he was concerned about detection by law enforcement, thereby further highlighting SCOTT's consciousness of guilt with regards to his and TILLMAN's bribery and fraud scheme.

175.    A short time later during the same recorded telephone call, SCOTT said, "The other thing is, is that what happened to you and I, we looked at, you told me no matter, remember the whole three or four times over the last twenty-four months.  You looked at me, we shook hands, you told me I'd never, we're not going to, no one, don't turn, don't, don't, not going to give you up and all that."

176.    Based on my training and experience and knowledge of this investigation, I believe SCOTT's statements illustrates his understanding that TILLMAN has information which, if provided to law enforcement, would uncover his and TILLMAN's bribery and fraud scheme.

177.    On May 24, 2017, at approximately 11:23AM, TILLMAN placed a recorded telephone call to SCOTT using the FBI's iTacc system.  During the conversation the following exchange took place:

RS:     I mean you're [TILLMAN] the one that's been steering the ship, and I don't think because where I live and where you live that's not fair.  You know I've been taking the entrepre, been taking the entrepreneurial risk and doing the work.  Also, and it's, and whatever I have is not just from the VA, that's the, they're [the federal government] going to have a big surprise when they find that out.  I have other things in my life going on besides the VA.

RT:     Well that's good to know.

RS:     That's what I'm saying, I don't understand how, so they [the federal
        government] all of a sudden they think what, they think that Westside took
        ten million dollars, is that what they're saying?

RT:     Five to ten is the number that [TILLMAN's attorney] told me.

RS:     I mean we go way, you know, I mean come on, usually it's not, and I
        thought, I thought that we we, you know, I thought that we were sticking,
        you know when you told me a hundred times, you weren't going to be,
        you know, rat out on me.

178.    Based on my training and experience, and knowledge of this investigation, I
believe that SCOTT initially was trying to convey to TILLMAN that he (SCOTT) made his
money through legitimate means over and above what he made from WSS' contract with the VA
in order to try to dissuade TILLMAN from cooperating with the government. I do not believe
that is true. Throughout this investigation, the federal government has obtained bank records and
other financial records pertaining to SCOTT and WSS. The bank records have been analyzed by
forensic accountants as well as other federal law enforcement agents. At no point during this
process have I been able to determine another significant source of income for SCOTT outside of
the income generated by WSS' contract with the VA. Furthermore, I and other law enforcement
agents involved in this investigation, have conducted multiple interviews of witnesses to
SCOTT's actions and activities and none of them have been able to identify a sustained source of
significant income over and above what WSS' generated with the VA. In addition, during the
same exchange, SCOTT told TILLMAN, "…I thought that we were sticking, you know when
you told me a hundred times, you weren't going to be, you know, rat out on me." When SCOTT
says, "rat out on me," I believe SCOTT was referring to TILLMAN cooperating with law
enforcement, which I believe made SCOTT's previous statement to TILLMAN about earning
legitimate income unrelated to WSS' contract with the VA, a false exculpatory statement,
because there would be nothing to "rat out," if true.

179.    Within the next few days, TILLMAN and SCOTT agreed to meet in person on
May 31, 2017 at a fast food restaurant in Los Angeles, CA.

180.    On May 31, 2017, at approximately 11:30AM, we met TILLMAN prior to his
scheduled meeting with SCOTT. We searched TILLMAN's person and vehicle. We found $405
cash in TILLMAN's wallet and some miscellaneous change in the center console of his vehicle.

We then placed two recording devices on TILLMAN's person and TILLMAN departed the area to engage in a recorded meeting with SCOTT.

181. A short time later, agents conducting surveillance, myself included, witnessed TILLMAN and SCOTT seated at the same table inside of the restaurant. TILLMAN and SCOTT were together inside the restaurant from approximately 12:01PM until approximately 12:41PM, when they exited the restaurant and entered TILLMAN's vehicle. SCOTT remained in TILLMAN's vehicle until approximately 12:56PM, when he exited TILLMAN's vehicle and the two of them departed the area in separate vehicles.

182. TILLMAN met government agents immediately after his meeting with SCOTT. We removed the two recording devices from TILLMAN's person and turned them off. TILLMAN then informed us that SCOTT had placed, what TILLMAN believed to be $300 in cash in his vehicle center console. TILLMAN gave us consent to search his vehicle. We found $250 (two 100-dollar bills and one 50-dollar bill) in TILLMAN's center console along with the miscellaneous change witnessed in the center console prior to the meeting. Additionally, we searched TILLMAN's person and found $405 in TILLMAN's wallet, the same amount witnessed in his wallet prior to the meeting. We seized the $250 found in TILLMAN's center console and placed the cash into FBI evidence.

183. A short time later, I reviewed the recordings made during TILLMAN's meeting with SCOTT on May 31, 2017. During their conversation, they began comparing their relationship to SCOTT's relationship with DT (Contractor 1), an individual who I believed to be a contractor that performed work for UCLA. During that time in the conversation, the following exchange occurred:

> RT:   ...With [Contractor 1] did you ever do anything?
>
> RS:   Yeah I did a little bit, but not like this.
>
> RT:   Yeah, but nothing like with me?
>
> RS:   No, [Unintelligible]. I don't know how they have any proof of anything though. That's the other thing, what happened to, you know, I thought you had the you know, you don't have nothing?

184. Based on my training and experience, and knowledge of this investigation, when SCOTT stated that he "did a little bit, but not like this," I believe SCOTT was acknowledging that he had a similar relationship with Contractor 1, to include bribery, as he did with

41

TILLMAN, but that the scope of illicit conduct with TILLMAN was much larger than with Contractor 1.

185.    A short time later during the same recorded meeting, the following exchange took place:

> RS:    Well what happed to, what happened to, you know, fifteen years with all this, with all this stuff you said to me.
>
> RT:    You mean that we would never, we would always…
>
> RS:    Yeah.  I mean, what happened to all of that?

186.    Based on my training and experience, and knowledge of this investigation, I believe SCOTT acknowledged that his and TILLMAN's corrupt relationship had been ongoing for fifteen years.  Furthermore, I believe that SCOTT and TILLMAN, at one point, had an agreement to never cooperate with law enforcement or reveal their corrupt relationship.

187.    During the same recorded meeting, TILLMAN inquired about SCOTT's other sources of income, other than the VA.  SCOTT replied, "Yeah, I do other stuff.  I buy and sell cars."  Based on my knowledge of this investigation, including FBI forensic analysis, I concur that SCOTT has purchased and sold multiple high-end cars over the past several years, however, the money used for down payments and monthly payments on the majority of the vehicles has come from proceeds of the fraud SCOTT has committed against the VA as a result of WSS' contract.

188.    A short time later, during the same recorded meeting, SCOTT made the following statement:

> RS:    …Here's the thing, this this has been happening all these years, and then…it's not like I had to, I don't know how to say this. I, I don't know, I just, I guess I [Unintelligible], I, I just, I thought we were going to 'hold the party line' as they say.  If they only got you for one hundred thousand bucks what's the, that's nothing.

189.    Based on my training and experience, and knowledge of this investigation, I believe that SCOTT stating that he and TILLMAN were going to "hold the party line" is another reference to his and TILLMAN's agreement not to cooperate with law enforcement's investigation into their bribery and fraud scheme.

190.    A short time later during the same conversation, the following exchange took place:

RT:    And you too.  Hey don't you feel, don't you feel like shit, uhh don't you feel like you know, like you said earlier, don't you feel like umm.  Okay, isn't there a part of you that knows, says okay, I know what I did but I don't want to get, you know I think I can get away with it, but isn't that still that feeling inside, I know what I did?

RS:    Ummm okay, I don't know [Unintelligible].

RT:    But, but you know what I mean?  It's the core, the core, we're trying to figure a way to stay out of jail, right?

RS:    We should.

RT:    But we know what we did, and that's bothering me.

RS:    It's a little late for that.

RT:    Yeah.

RS:    We could, we could have ceased and desisted a long time ago.

RT:    Haha true.

191.    Based on my training and experience, and knowledge of this investigation, I believe the exchange outlined above illustrates SCOTT's consciousness of guilt when he replies to TILLMAN's concern regarding jail time and expressions of guilt by stating, "It's a little late for that" and, "...we could have ceased and desisted a long time ago."  I believe that SCOTT was referring to the bribery and fraud scheme in the latter quote.

192.    Lastly, during the same recorded conversation, the following exchange took place:

RS:    You know what, even in the face of all this I'm going to give you a couple hundred[39], a couple for beer money because I'm sure you need a drink.  But you always told me, your word, you'd never turn on me.  You're about to, that really bums me out, and I thought about what would happen in the reverse.

---

[39] At this point in the recorded conversation, I believe SCOTT and TILLMAN were in TILLMAN's vehicle and SCOTT's reference to "a couple hundred" was the cash we recovered from TILLMAN's center console.

43

RT:  What?  You wouldn't?

RS:  I wouldn't have.  I'd just go down with the ship, I don't fucking care.  I'll go half, give you the other half tomorrow.

RT:  Alright.

RS:  No, I would.  It's just, it's been too long, how long have they known?  My god, seventeen years?

193.  Based on my training and experience, and knowledge of this investigation, I believe that SCOTT gave TILLMAN money as part of SCOTT's ongoing monthly pattern of paying, what TILLMAN described previously as bribes or hush money, because as SCOTT gives TILLMAN the cash, he expressed his disappointment that TILLMAN appeared to be willing to cooperate with law enforcement.  Furthermore, I believe that SCOTT telling TILLMAN that he would "go down with the ship" is further evidence of SCOTT's consciousness of guilt for having engaged in the bribery and fraud scheme outlined in this affidavit.

## G.     Richard SCOTT Discusses Escape Plan with Ralph TILLMAN

194.  During a conversation between TILLMAN and SCOTT, which took placed before TILLMAN agreed to cooperate with the government, TILLMAN stated that SCOTT asked him what his (TILLMAN's) escape plan would be.  I believe SCOTT asked TILLMAN this because he was concerned that his and TILLMAN's bribery and fraud scheme would eventually be uncovered by law enforcement.  TILLMAN replied that he would consider purchasing a truck and becoming a truck driver.  SCOTT told TILLMAN that his (SCOTT's) plan was to leave his wife and flee the United States to either Costa Rica or Panama because he could live well, use cash, and fit in as an "ex-pat."  TILLMAN took this conversation as something that SCOTT had contemplated but was not imminent at that time.

195.  In or about 2015, SCOTT told TILLMAN that he obtained an un-attributable phone (aka a "burner phone") and suggested that TILLMAN purchase one too.  I believe SCOTT took these steps as a way to elude detection by law enforcement because he was aware that his and TILLMAN's conversations over the phone would be criminal in nature, referencing their bribery and fraud scheme.  Shortly thereafter TILLMAN purchased a burner phone, using all cash, from Verizon, and used it to solely communicate with SCOTT for approximately six months.  SCOTT used his burner phone until approximately six months before TILLMAN began

cooperating with federal law enforcement. TILLMAN believed that SCOTT's burner phone had a Florida area code.

196.     Based on my training and experience, and my knowledge of this investigation, I believe that the discussions and actions outlined above, between SCOTT and TILLMAN, further illustrated SCOTT's consciousness of guilt related to his past bribery and fraud scheme orchestrated with TILLMAN. Furthermore, I believe SCOTT currently has the means, opportunity, and desire to flee the United States to avoid prosecution because SCOTT owns a high-speed Cigarette boat, which is docked in Miami, FL, has access to large sums of cash and a passport, and he has stated his desire to flee to TILLMAN.

## XI.     OWNERSHIP AND CONTROL OF THE PREMISES TO BE SEARCHED

## A.     The SCOTT RESIDENCE

197.     On June 28, 2017, we interviewed JO, President and CEO of Ocean Towers Housing Corporation ("Ocean Towers"), who explained that Ocean Towers Housing Corporation owns and operates the co-op condominium complex located at 201 Ocean Avenue, Santa Monica, CA ("201 Ocean Avenue"). JO stated that SCOTT owns units 804B, 1404P, and 1209P at 201 Ocean Avenue. JO confirmed that SCOTT personally resides in unit 1209P with his wife, and SCOTT rents out units 804B and 1404P.

198.     Records obtained from Ocean Towers show that SCOTT individually possesses 425 shares of the capital stock of Ocean Towers via stock certificate 1242. Jointly with his wife, SCOTT owns another 926 shares of the capital stock of Ocean Towers, 491 shares via stock certificate 1737 and 435 shares via stock certificate 1615. Records also show that monthly payments via check, drawn on a First Republic Bank account in the name of SCOTT and his wife, made payable to Ocean Towers, have indicated in the memo line that the payments are for 1209P.

199.     According to records obtained from BST Escrow, Inc., SCOTT and his wife acquired unit 1209P at 201 Ocean Avenue on April 2, 2015. Records show that SCOTT and his wife acquired stock certificate number 1737, which was for 491 shares of capital stock of Ocean Towers, upon acquiring the unit 1209P at 201 Ocean Avenue.

200.     On July 7, 2017, JO explained that units at 201 Ocean Avenue can be purchased one of two ways. The first way is to pay for the unit using all cash, and subsequently sign the Ocean Towers proprietary lease agreement. The second way is to make a down payment equal

to a certain percentage of the overall price of the unit, secure financing for the remaining balance from a lender, and then sign the proprietary lease agreement. In an email from JO, he stated that he was able to track down SCOTT's escrow for unit 1209P. SCOTT purchased the unit for a total price of $2,475,000 with a down payment of $1,009,000, and SCOTT financed the remaining amount through a loan from First Republic Bank.

## B.    The GARAGE

201.    During the interview with JO on June 28, 2017, he explained that SCOTT owned a "slew" of vehicles that were parked on the premises of 201 Ocean Avenue. After the interview, VN, Doorman for Ocean Towers, escorted us around the ground level and subterranean level of the GARAGE, while pointing out the various vehicles that were owned by SCOTT. It was noted that SCOTT owned a white Ferrari, VIN ZFF65TJA6E0195924, which was parked in spot 423; a green Ford Bronco, no visible VIN, which was parked in spot 425; a black Chevrolet Corvette that was covered in a brown car cover, no visible VIN, which was parked in spot 535A; a black Ferrari F40, no visible VIN, which was parked in spot 570; a black Ferrari F430, no visible VIN, which was parked in spot 570A; a black Ford Shelby Super Snake, VIN 1ZVBP8KS6A5153369, which was parked in spot 674; a black Chevrolet Corvette Sting Ray, no visible VIN, which was parked in spot 674A; and a black Mercedes-Benz SLR McLaren, VIN WDDAJ76F25M000304, which was parked in spot 672A. We were also informed that SCOTT also owned a black Mercedes-Benz G63, which was usually parked in spot 425 that was not present at the time, and a black Mercedes-Benz S65, which was usually parked in spot 535 but was also not present at the time.

202.    On October 20, 2017, we conducted surveillance of the GARAGE. The following vehicles were witnessed while conducting surveillance of the GARAGE a white Ferrari, VIN ZFF65TJA6E0195924, which was parked in spot 423; a green Ford Bronco, no visible VIN, which was parked in spot 425; a black vehicle similar to the Chevrolet Corvette previously seen, covered in a brown car cover with no visible VIN, which was parked in spot 535A; a black vehicle similar to the Ferrari F40 previously seen, covered in a red Ferrari car cover with no visible VIN, which was parked in spot 570; a black vehicle similar to the Ferrari F430 previously seen, covered in a red Ferrari car cover with no visible VIN, which was parked in spot 570A; a black Ford Shelby Super Snake, VIN 1ZVBP8KS6A5153369, which was parked in spot 674; a black Chevrolet Corvette Sting Ray, no visible VIN, which was parked in spot 674A; a black

Mercedes-Benz G63, VIN WDCYC7DFG0GX246818, which was parked in spot 425; black Mercedes-Benz S65, VIN WDDUG7KB1FA100976, which was parked in spot 535. Not present at the time we conducted surveillance was a black Mercedes-Benz SLR McLaren, VIN WDDAJ76F25M000304, which was previously seen parked in spot 672A.

## C.     The BRONCO

203.     While being escorted around the GARAGE on June 28, 2017, VN indicated that SCOTT owned a green Ford Bronco that was parked in spot 425, but had no visible VIN from the exterior of the vehicle. As described above in paragraphs 93-96, SCOTT purchased a green 1973 Ford Bronco on or about September 22, 2015. Included in records obtained from Mecum Auction was a completed "Dealer's Reassignment of Title for A Motor Vehicle" form, in which it stated that the vehicle was free and clear of all liens and has been transferred to SCOTT. On October 20, 2017, we again observed the green Ford Bronco, which was previously seen on June 28, 2017, parked in spot 425.

## D.     The CORVETTE

204.     While being escorted around the GARAGE on June 28, 2017, VN indicated that SCOTT owned a black Chevrolet Corvette, which was covered with a brown car cover and parked in spot 535A.[40] As described above in paragraphs 77-81, SCOTT purchased a black 1969 L88 Chevrolet Corvette on or about September 22, 2015. A query of California Department of Motor Vehicles ("CA DMV") records showed that SCOTT registered a 1969 Chevrolet, VIN 194679S719392 on or about August 10, 2015. On October 20, 2017, we again observed the black Chevrolet Corvette, which was previously seen on June 28, 2017, parked in spot 535A.

## E.     The FERRARI F40

205.     While being escorted around the GARAGE on June 28, 2017, VN indicated that SCOTT owned a black Ferrari F40 that was parked in spot 570, but had no visible VIN from the exterior of the vehicle. As described above in paragraphs 63-69, SCOTT purchased a black 1991 Ferrari F40 on or about January 17, 2015. Included in the records obtained from Barrett-Jackson was a completed "Assignment of Title" form, in which it stated that the vehicle was free and clear of all liens and has been transferred to SCOTT. On October 20, 2017, we again observed

---

[40] Without the agents instructing him to do so, VN, Doorman at Ocean Towers, removed the rear portion of the car cover, which revealed California license plate number "L88."

the black Ferrari F40, which was previously seen on June 28, 2017, parked in spot 570, but it appeared to have been covered by a red Ferrari car.

**F.    The FERRARI F430**

206.    While being escorted around the GARAGE on June 28, 2017, VN indicated that SCOTT owned a black Ferrari F430 that was parked in spot 570A, but had no visible VIN from the exterior of the vehicle. As described above in paragraphs 97-101, SCOTT purchased a black 2005 Ferrari F430 on or about April 29, 2005. A query of CA DMV records showed that SCOTT registered a 2005 Ferrari, VIN ZFFEW58AX50141441 on or about June 30, 2005. On October 20, 2017, we again observed the black Ferrari F430, which was previously seen on June 28, 2017, parked in spot 570A, but it appeared to have been covered by a red Ferrari car.

**XII.    SUMMARY OF PROBABLE CAUSE TO BELIEVE THAT UNITED STATES CURRENCY EXISTS AT THE SCOTT RESIDENCE**

207.    Based on my training and experience, and knowledge of this investigation, I believe there is probable cause to believe that significant amounts of United States currency are being stored in the SCOTT RESIDENCE. Based on the foregoing, my training, my knowledge of this investigation, and my consultation with other law enforcement agents, I know the following:

208.    It is common practice for individuals engaged in bribery and fraud crimes to store United States currency and financial instruments fraudulently or inappropriately obtained at their residences. Individuals engaged in bribery and fraud crimes often use their residence to store and hide proceeds of the crimes. They often possess safes, locked containers, and/or hidden compartments at their residence in order to store and conceal proceeds of the crime.

209.    Interviews conducted with multiple WSS employees have indicated that WSS collects large amounts of cash and checks as a result of their daily operations. These individuals have stated that cash collected by WSS is placed in an envelope and personally handed to SCOTT. A WSS Manager reported dropping off envelopes of cash and checks to SCOTT in the valet area of 201 Ocean Avenue on a weekly basis. Statements made by SCOTT to TILLMAN indicate that SCOTT received large sums of cash as a result of WSS' business operations, and that SCOTT was concerned about proceeds from illegal activity being deposited into bank accounts. A review of the bank accounts for SCOTT and WSS also indicate that there are

significant amounts of cash generated from WSS business operations that are not being deposited into bank accounts.

210.    On October 18, 2017 AS, WSS Manager, stated that WSS does not have a physical office building.  AS also described the various revenue generating activities that WSS performs, and the processes SCOTT has in place for collecting parking fees.

211.    AS stated that the Barrington Place Lot generates $1,300 in cash on a weekly basis, which AS would place in an envelope, and personally deliver to SCOTT.  AS noted, there have only been two or three instances where SCOTT asked AS to deposit cash in the WSS' Wells Fargo Bank account.

212.    AS approximated that WSS generated between $300 and $2,000 per UCLA baseball game, which was always paid in the form of cash or check.  AS explained that the cash and checks were placed in an envelope and driven 201 Ocean Avenue, where AS would wait in the valet area for SCOTT to come down and personally pick up the envelope.  AS noted, he typically drove his own vehicle to make the drop offs, but SCOTT had rented him a Toyota Camry for a month when his personal vehicle was not working.

213.    On July 7, 2017, JO stated the Doorman for Ocean Towers informed him that an unidentified individual met SCOTT at 201 Ocean Avenue the last Wednesday of every month and passed a large sum of cash to SCOTT.  JO noted that it was rumored the cash was proceeds from a valet business that SCOTT has an interest in.  On or about July 19, 2017 JO stated the unidentified individual had shown up that day and met SCOTT in the valet area of 201 Ocean Avenue.  JO described the unidentified individual as a Latino male in his 30s with dark colored hair, and noted the vehicle he was driving was a 2012 to 2014 silver Toyota Camry, bearing a license plate number 7XIB244.

214.    According to records obtained from Hertz Rental Car, SCOTT rented a vehicle bearing the license plate number 7XIB244 and VIN 4T1BF1FK9HU790288 from June 16, 2017 until July 21, 2017.  An open source search of the VIN indicated that the vehicle rented by SCOTT was a 2017 Toyota Camry.

215.    During a September 23, 2017 interview with EH, former WSS employee from 2004 to 2014, EH noted there were various events held at the Brentwood Theater and Wadsworth Theater during which WSS would collect parking fees in the form of cash.  EH stated that WSS

also collected cash at the Barrington Place Lot, and what EH estimated to be between $300 and $3,000 for each UCLA baseball game.

216.   EH noted that all the cash and checks that were received by WSS were placed in an envelope and personally given to SCOTT. EH noted AS and VC typically made the cash deliveries to SCOTT, but acknowledged personally delivering an envelope of cash and checks to SCOTT on two occasions.

217.   During a September 6, 2017 interview with VC, former WSS Manager, who was employed with WSS from 2003 until 2013, VC stated one of his responsibilities was to collect the proceeds from various parking events and personally provide them to SCOTT. VC would place the cash and checks that were generated from an event in a manila envelope, write some details about the event and amount of money collected on the front of the envelope, and SCOTT would usually stop by the Barrington Place Lot in the following days to pick up the envelope.

218.   As discussed above in paragraph 169, when TILLMAN stated that he should not have deposited the cash SCOTT stated "Told you a hundred times, I told you, and I told you, and I told you, make sure you're not depositing this." Based on my training and experience, and knowledge of this investigation, SCOTT is concerned about illegal proceeds being deposited into a bank account, as it creates a financial trail that could be discovered by law enforcement. In addition, TILLMAN has stated that on multiple occasions SCOTT has commented on how he "likes cash contractors." As such, it is unlikely that SCOTT would deposit cash earned from WSS business that was not reported to VA into any bank account, as it would create a financial trail that could be tracked by law enforcement.

219.   Financial analysis of the Wells Fargo Bank accounts and CNB accounts for SCOTT and WSS show minimal cash deposits. Given the nature of the business and the statements made by WSS employees regarding the amount of cash generated from WSS daily operations, I would expect to see much more in the way of cash deposits into these various accounts.

## XIII. SUMMARY OF PROBABLE CAUSE TO BELIEVE THAT RECORDS EXIST AT THE SCOTT RESIDENCE

220.   Based on my training and experience, and knowledge of this investigation, I believe there is probable cause to believe that records to be seized are being stored in the SCOTT

RESIDENCE. Based on the foregoing, my training, my knowledge of this investigation, and my consultation with other law enforcement agents, I know the following:

221.    It is common practice for individuals engaged in bribery and fraud to use and maintain computers, cellular phones, smartphones, and other digital devices. They often employ such devices when using money obtained from fraud to make purchases, and also to keep record of their crimes on such devices.

222.    It is common for individuals involved in bribery or fraud schemes to store documents or records of proceeds that were fraudulently or inappropriately obtained or spent at their residence. These individuals often use their residence to store, hide, sort, view, or alter evidence of their crimes, including any goods that have been purchased with misused or fraudulent funds. Based on my training and experience, as well as my knowledge of this investigation and information related to me by other law enforcement personnel who specialize in the investigation of bribery and fraud crimes, even if an individual has an accountant, business manager, or other professional service provider that is able to store physical and digital records on behalf of the client, it is unlikely that documents or records of proceeds that were fraudulently or inappropriately obtained or spent would be given to a profession service provider to store.

223.    Individuals typically keep at their residence records of income (both reported and unreported) and expenditures in the form of invoices, receipts, contracts, bank account statements, loan documents, tax returns, information used to prepare tax returns, bank records, insurance documents, titles, registration documents, travel records, letters, and correspondence. I also know that records of this kind tend to be kept for long periods as they are used in financial, tax, and legal matters.

224.    Based on my training and experience, as well as my knowledge of this investigation and information related to me by other law enforcement personnel who specialize in the investigation of bribery and fraud crimes, it is likely that any digital devices contained in the SCOTT RESIDENCE were used in furtherance of the offenses described in Attachment B.

225.    Interviews conducted with multiple WSS employees and WSS' third-party Business Manager have indicated that WSS does not have a physical office. Multiple WSS employees have stated that cash and checks that are collected are placed in an envelope and personally handed to SCOTT. A WSS employee also reported delivering signed contracts to SCOTT. Interviews conducted with WSS employees and WSS' third-party Business Manager

indicate that SCOTT was personally preparing Settlement Statements that were provided to the VA in furtherance of the fraud scheme.

226.    October 18, 2017, AS stated that WSS did not have a physical office building. AS also stated that cash and checks collected during the normal course of WSS business operations were placed in an envelope, which was then driven by AS to 201 Ocean Avenue and personally handed to SCOTT.  AS never saw, nor was he aware of, the Settlement Statements SCOTT provided to the VA.

227.    On September 23, 2017, EH stated that WSS did not have a physical office space. EH noted that all the cash and checks that were received by WSS were placed in an envelope and personally given to SCOTT.

228.    On September 6, 2017, VC also stated that to the best of his knowledge WSS never had a physical office space.  According to statements by VC, cash and checks generated by WSS business operations were placed in a manila envelope, details such as date and amount of money collected were written on the front of the envelope, and SCOTT would typically pick up the envelope.  VC stated that he would also pick up signed contracts from film crews, who rented space in various VA lots.  VC personally provided the signed contracts to SCOTT.

229.    In an interview with ER, FM Partner and Business Manager, on September 29, 2017, ER noted that WSS did not have a physical office building, but that SCOTT maintained a Post Office Box for the business.  SCOTT would on occasion provide records to be scanned and stored digitally by FM.  Original copies of records stored by FM were either returned to WSS or destroyed.  With the exception of some tax documents, FM did not receive mail on behalf of WSS.  As such, aside from these tax documents and bank or credit card statements downloaded by ER, the majority of WSS records that were maintained by FM had been provided by SCOTT.

230.    ER prepared the financial statements and financial reports for WSS, which were then used in preparation of the tax return or provided to SCOTT upon request.  ER stated that prior to being shown the documents by VA OIG agents, she had never seen the Settlement Statements SCOTT provided to the VA.  ER did not know where the numbers on the Settlement Statements had come from or if they were accurate.  ER did not prepare the statements, nor did she believe anyone at FM prepared them before she acquired the WSS account.  ER believed that SCOTT must have generated the Settlement Statements himself, as she did not believe that SCOTT had anyone else that could have prepared the statements.

## XIV.  SUMMARY OF PROBABLE CAUSE TO BELIEVE THAT VEHICLES PURCHASED WITH PROCEEDS OF THE FRAUD EXIST IN THE GARAGE

231.    Based on my training and experience, and knowledge of this investigation, I believe there is probable cause to believe that vehicles purchased with proceeds of the fraud are being stored in the GARAGE.  Based on the foregoing, my training, my knowledge of this investigation, and my consultation with other law enforcement agents, I know the following:

232.    Vehicles containing VINs matching those listed in the financial analysis as being proceeds of the bribery and fraud scheme, and listed in the application for seizure warrants, have been witnessed parked in the GARAGE.  In addition, vehicles matching the description of those listed in the financial analysis as being purchased with proceeds of the bribery and fraud scheme, and listed in the application for seizure warrants, have also been witnessed parked in the GARAGE but the VIN is not visible from the outside of the vehicle.  It is likely that the VIN on these vehicles is listed in the door frame, engine block, or another location within the cab or under the hood of the vehicle.  I believe that a search of these vehicles (The BRONCO, The CORVETTE, The FERRARI F40, and The FERRARI F430) will allow agents to identify the VIN and determine if the vehicle was indeed purchased with proceeds of the fraud.  In addition, SCOTT does not own any other real property that I am aware of, at which he could store vehicles purchased with proceeds of the fraud.  SCOTT rents three storage units, but based on the location of the facilities, the size of the units rented, the hours of operations at the facilities, and the frequency with which SCOTT enters the premises, it is unlikely that SCOTT would store vehicles purchased with proceeds of the bribery and fraud scheme in these locations.

233.    While being escorted around the GARAGE on June 28, 2017, VN indicated that SCOTT owned a white Ferrari, VIN ZFF65TJA6E0195924, which was parked in spot 423; a green Ford Bronco, no visible VIN, which was parked in spot 425; a black Chevrolet Corvette that was covered in a brown car cover, no visible VIN, which was parked in spot 535A; a black Ferrari F40, no visible VIN, which was parked in spot 570; a black Ferrari F430, no visible VIN, which was parked in spot 570A; a black Ford Shelby Super Snake, VIN 1ZVBP8KS6A5153369, which was parked in spot 674; a black Chevrolet Corvette Sting Ray, no visible VIN, which was parked in spot 674A; and a black Mercedes-Benz SLR McLaren, VIN WDDAJ76F25M000304, which was parked in spot 672A.  We were also informed that SCOTT also owned a black Mercedes-Benz G63, which was usually parked in spot 425 that was not present at the time, and

a black Mercedes-Benz S65, which was usually parked in spot 535 but was also not present at the time.

234.    On October 20, 2017, we conducted surveillance of the GARAGE. The following vehicles were witnessed while conducting surveillance of the GARAGE a white Ferrari, VIN ZFF65TJA6E0195924, which was parked in spot 423; a green Ford Bronco, no visible VIN, which was parked in spot 425; a black vehicle similar to the Chevrolet Corvette previously seen, covered in a brown car cover with no visible VIN, which was parked in spot 535A; a black vehicle similar to the Ferrari F40 previously seen, covered in a red Ferrari car cover with no visible VIN, which was parked in spot 570; a black vehicle similar to the Ferrari F430 previously seen, covered in a red Ferrari car cover with no visible VIN, which was parked in spot 570A; a black Ford Shelby Super Snake, VIN 1ZVBP8KS6A5153369, which was parked in spot 674; a black Chevrolet Corvette Sting Ray, no visible VIN, which was parked in spot 674A; a black Mercedes-Benz G63, VIN WDCYC7DFG0GX246818, which was parked in spot 425; black Mercedes-Benz S65, VIN WDDUG7KB1FA100976, which was parked in spot 535. Not present at the time we conducted surveillance was a black Mercedes-Benz SLR McLaren, VIN WDDAJ76F25M000304, which was previously seen parked in spot 672A.

## XV.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES

235.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

236.    Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

237.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

238.    The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

239.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.  Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data

55

in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

240.    Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

241.    Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because

the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

242.   Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

243.   As discussed herein, based on my training and experience I believe that digital devices will be found during the search. I know from my training and experience and my review of publicly available materials that Apple Inc., Motorola, HTC, and Samsung, among other companies, produce devices that can be unlocked by the user with a numerical or an alpha-numerical password or, for some newer versions of the devices, with a fingerprint placed on a fingerprint sensor. Each company has a different name for its fingerprint sensor feature; for example, Apple's is called "Touch ID." Once a user has set up the fingerprint sensor feature in the security settings of the device, the user can unlock the device by placing a finger or thumb on the device's fingerprint sensor. If that sensor recognizes the fingerprint or thumbprint, the device unlocks. Most devices can be set up to recognize multiple prints, so that different prints, not necessarily from the same person, will unlock the device. In my training and experience, users

of devices with a fingerprint sensor feature often enable that feature, because it unlocks the phone more quickly than the entry of a passcode or password but still offers a layer of security.

244.    In some circumstances, fingerprint sensors will not work, and a passcode must be entered to unlock the device.  For example, with Apple's Touch ID feature, these circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked; and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; and (3) five unsuccessful attempts to unlock the device via Touch ID are made.  Other brands have similar restrictions.  I do not know the passcodes of the devices likely to be found at the SUBJECT PREMISES.

245.    For these reasons, while executing the warrant, agents will likely need to use the fingerprints or thumbprints of SCOTT on any fingerprint sensor-enabled device(s) to attempt to gain access to that device while executing the search warrant.  The warrant seeks the authority to compel the use of the fingerprint and/or thumbprint of SCOTT so long as he is located at the SUBJECT PREMISES during the execution of the search and who is reasonably believed by law enforcement to be a user of a fingerprint sensor-enabled device that is located at the SUBJECT PREMISES and falls within the scope of the warrant.  The government may not be able to obtain the contents of the devices if those fingerprints are not used to access the devices by depressing them against the fingerprint sensor at the time of the search.  Although I do not know which of the fingers are authorized to access on any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors, and in any event all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

246.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## XVI.    CONCLUSION

247.    For the reasons described above, there is probable cause to believe that SCOTT has committed a violation of 18 U.S.C. § 1031 (Major Fraud Against the United States).

248.    For the reasons described above, there is probable cause to believe that evidence, fruits, and instrumentalities of the offenses described in Attachment B will be found at the premises described in Attachments A-1 through A-6.

249.    For the reasons described above, there is probable cause to believe that the subject vehicles, boat, brokerage accounts constitute or are derived from proceeds traceable to the following criminal violations: Bribery of Public Officials (18 U.S.C. § 201); Conspiracy to Defraud the Government With Respect to Claims (18 U.S.C. § 286); False, Fictitious, or Fraudulent Claims (18 U.S.C. § 287); Conspiracy (18 U.S.C. § 371); Theft of Government Property or Money (18 U.S.C. § 641); Civil Forfeiture (18 U.S.C. § 981); Criminal Forfeiture (18 U.S.C. § 982); False Statements (18 U.S.C. § 1001); Major Fraud Against the United States (18 U.S.C. § 1031); Mail Fraud (18 U.S.C. § 1341); Wire Fraud (18 U.S.C. § 1343); Obstruction of Criminal Investigations (18 U.S.C. § 1510); Laundering of Monetary Instruments (18 U.S.C. § 1956); Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity (18 U.S.C. § 1957); Interstate Transportation of Stolen Property (18 U.S.C. § 2314); and Sale or Receipt of Stolen Goods or Monies (18 U.S.C. § 2315).


/s/
_____
Michael Torbic, Special Agent
Federal Bureau of Investigation


Subscribed to and sworn before me
This _3_ day of November, 2017


**ALKA SAGAR**
_____
HONORABLE ALKA K. SAGAR
UNITED STATES MAGISTRATE JUDGE

## APPENDIX ONE:  FINANCIAL ANALYSIS BY YEAR

**A.**     **Revenue Analysis By Year**

1.     Members of the investigative team performed a detailed year-by-year analysis of revenue, a summary of which is included below.  The analysis was based upon comparison of Settlement Statements SCOTT submitted to VA, WSS' QuickBooks, and WSS' bank and financial records.  We calculated the actual revenue that WSS earned each year by analyzing deposits into the CNB and Wells Fargo WSS' bank accounts, which was supplemented with income reported in WSS' QuickBooks as needed.  The actual revenue that WSS earned was compared to what was reported by SCOTT on the Settlement Statements in order to determine the amount of revenue that was underreported for each year.

*2003*

2.     For calendar year 2003, WSS reported $894,250.00 in total revenue on the Settlement Statement.  According to analysis of WSS' QuickBooks, WSS' revenue for 2003 was $1,760,349.96.  We have determined that WSS underreported revenue to VA for 2003 in the amount of $866,099.96.  Based on The Contract, VA was entitled to $1,056,209.98 of revenue for 2003, 60 percent of the actual gross revenue for the year.

| Customer | WSS Settlement Statements | Actual Revenue[41] | Over/(Under) Reported |
|---|---|---|---|
| Tumbleweed | $162,000.00 | | |
| UCLA | $240,000.00 | | |
| Nissan Golf (LA C of C) | $45,000.00 | | |
| Walker Burgue (sic) | $106,000.00 | | |
| Barrington Pl/Lot Income plus Misc. Film and Other Parking | $341,250.00 | | |
| **TOTAL** | **$894,250.00** | **$1,760,349.96** | **($866,099.96)** |

*2004*

3.     For calendar year 2004, WSS reported $1,557,606.86 in total revenue on the Settlement Statement.  According to analysis of WSS' QuickBooks and records obtained from customers, WSS' revenue for 2004 was $2,605,074.47.  We have determined that WSS

---

[41] WSS' QuickBooks data for 2003 did not break out revenue by customer.

underreported revenue to VA for 2004 in the amount of $1,047,467.61. Based on The Contract, VA was entitled to $1,563,044.68 of revenue for 2004, 60 percent of the actual gross revenue for the year.

| Customer | WSS Settlement Statements | Actual Revenue | Over/(Under) Reported |
|---|---|---|---|
| Buerge Ford | $115,753.38 | $116,753.38 | ($1,000.00) |
| Tumbleweed | $151,050.00 | $164,400.00 | ($13,350.00) |
| UCLA | $678,696.13 | $741,096.00 | ($62,399.87) |
| Getty | $215,971.00 | $861,555.00 | ($645,584.00) |
| Nissan Golf (LA C of C) | $47,500.00 | $0.00 | $47,500.00 |
| Barrington Pl/Lot Income plus Misc. Film and Other Parking | $348,636.35 | $721,270.09 | ($372,633.74) |
| TOTAL | $1,557,606.86 | $2,605,074.47 | ($1,047,467.61) |

### 2005

4.      For calendar year 2005, WSS reported $1,809,175.09 in total revenue on the Settlement Statement. According to analysis of WSS' QuickBooks and records obtained from customers, WSS' revenue for 2005 was $2,058,499.45. We have determined that WSS underreported revenue to VA for 2005 in the amount of $249,324.36. Based on The Contract, VA was entitled to $1,235,099.67 of revenue for 2005, 60 percent of the actual gross revenue for the year.

| Customer | WSS Settlement Statements | Actual Revenue | Over/(Under) Reported |
|---|---|---|---|
| Buerge Ford | $97,574.16 | $97,574.16 | $0.00 |
| Buerge Chrysler/Jeep | $0.00 | $34,000.00 | ($34,000.00) |
| Tumbleweed | $225,272.46 | $260,122.46 | ($34,850.00) |
| UCLA | $750,820.00 | $750,820.00 | $0.00 |
| Getty | $220,042.00 | $21,710.00 | $198,332.00 |
| Enterprise Rent-A-Car | $96,000.00 | $96,000.00 | $0.00 |
| Nissan Golf (LA C of C) | $47,500.00 | $0.00 | $47,500.00 |
| Barrington Pl/Lot Income plus Misc. Film and Other Parking | $371,966.47 | $798,272.83 | ($426,306.36) |
| TOTAL | $1,809,175.09 | $2,058,499.45 | ($249,324.36) |

### 2006

5.      For calendar year 2006, WSS reported $1,940,407.25 in total revenue on the Settlement Statement.  According to analysis of WSS' QuickBooks and records obtained from customers, WSS' revenue for 2006 was $2,121,899.70.  We have determined that WSS underreported revenue to VA for 2006 in the amount of $181,492.45.  Based on The Contract, VA was entitled to $1,273,139.82 of revenue for 2006, 60 percent of the actual gross revenue for the year.

| Customer | WSS Settlement Statements | Actual Revenue | Over/(Under) Reported |
|---|---|---|---|
| Buerge Chrysler/Jeep | $222,200.00 | $252,200.00 | ($30,000.00) |
| Tumbleweed | $161,695.25 | $195,900.89 | ($34,205.64) |
| UCLA | $709,680.00 | $709,680.00 | $0.00 |
| Getty | $226,332.00 | $24,000.00 | $202,332.00 |
| Enterprise Rent-A-Car | $160,000.00 | $160,000.00 | $0.00 |
| Nissan Golf (LA C of C) | $60,000.00 | $60,000.00 | $0.00 |
| Barrington Pl/Lot Income plus Misc. Film and Other Parking | $400,500.00 | $720,118.81 | ($319,618.81) |
| **TOTAL** | **$1,940,407.25** | **$2,121,899.70** | **($181,492.45)** |

*2007*

6.      For calendar year 2007, WSS reported $2,145,800.64 in total revenue on the Settlement Statement.  Based on financial analysis of bank records obtained from CNB and Wells Fargo and WSS' QuickBooks, WSS' revenue for 2007 was $2,499,236.20.  We have determined that WSS underreported revenue to VA for 2007 in the amount of $353,435.56. Based on The Contract, VA was entitled to $1,499,541.72 of revenue for 2007, 60 percent of the actual gross revenue for the year.

| Customer | WSS Settlement Statements | Actual Revenue | Over/(Under) Reported |
|---|---|---|---|
| Buerge Ford | $201,300.00 | $211,300.00 | ($10,000.00) |
| Buerge Chrysler/Jeep | $0.00 | $21,100.00 | ($21,100.00) |
| Tumbleweed | $261,582.64 | $277,583.14 | ($16,000.50) |
| UCLA | $804,540.00 | $804,540.00 | $0.00 |
| Getty | $212,835.00 | $321,330.00 | ($108,495.00) |
| Enterprise Rent-A-Car | $208,000.00 | $208,000.00 | $0.00 |
| Nissan Golf (LA C of C) | $65,000.00 | $65,000.00 | $0.00 |

| | | | |
|---|---|---|---|
| Barrington Pl/Lot Income plus Misc. Film and Other Parking | $392,543.00 | $590,383.06 | ($197,840.06) |
| **TOTAL** | **$2,145,800.64** | **$2,499,236.20** | **($353,435.56)** |

### *2008*

7.      For calendar year 2008, WSS reported $1,745,837.18 in total revenue on the Settlement Statement.  Based on financial analysis of bank records obtained from CNB and Wells Fargo and WSS' QuickBooks, WSS' revenue for 2008 was $2,165,278.58.  We have determined that WSS underreported revenue to VA for 2008 in the amount of $419,441.40. Based on The Contract, VA was entitled to $1,299,167.15 of revenue for 2008, 60 percent of the actual gross revenue for the year.

| Customer | WSS Settlement Statements | Actual Revenue | Over/(Under) Reported |
|---|---|---|---|
| Buerge Ford | $96,100.00 | $106,100.00 | ($10,000.00) |
| Buerge Chrysler/Jeep | $0.00 | $10,000.00 | ($10,000.00) |
| Tumbleweed | $242,092.18 | $242,092.18 | $0.00 |
| UCLA | $630,580.00 | $820,060.00 | ($189,480.00) |
| Getty | $127,665.00 | $98,700.00 | $28,965.00 |
| Enterprise Rent-A-Car | $192,000.00 | $192,000.00 | $0.00 |
| Nissan Golf (LA C of C) | $60,000.00 | $60,000.00 | $0.00 |
| Barrington Pl/Lot Income plus Misc. Film and Other Parking | $397,400.00 | $636,326.40 | ($238,926.40) |
| **TOTAL** | **$1,745,837.18** | **$2,165,278.58** | **($419,441.40)** |

### *2009*

8.      For calendar year 2009, WSS reported $1,688,766.79 in total revenue on the Settlement Statement.  Based on financial analysis of bank records obtained from CNB and Wells Fargo and WSS' QuickBooks, WSS' revenue for 2009 was $2,007,642.99.  We have determined that WSS underreported revenue to VA for 2009 in the amount of $318,876.20. Based on The Contract, VA was entitled to $1,204,585.79 of revenue for 2009, 60 percent of the actual gross revenue for the year.

| Customer | WSS Settlement Statements | Actual Revenue | Over/(Under) Reported |
|---|---|---|---|
| Northern Trust Golf (PGA Tour) | $62,100.00 | $0.00 | **$62,100.00** |
| Buerge Ford | $76,000.00 | $92,500.00 | **($16,500.00)** |
| Buerge Chrysler/Jeep | $0.00 | $10,000.00 | **($10,000.00)** |
| Tumbleweed | $249,177.18 | $249,177.18 | **$0.00** |
| UCLA | $680,480.00 | $729,230.00 | **($48,750.00)** |
| Getty | $39,375.00 | $96,600.00 | **($57,225.00)** |
| Enterprise Rent-A-Car | $192,491.56 | $192,491.56 | **$0.00** |
| Nissan Golf (LA C of C) | $0.00 | $60,000.00 | **($60,000.00)** |
| Barrington Pl/Lot Income plus Misc. Film and Other Parking | $389,143.05 | $576,444.25 | **($187,301.20)** |
| Cash Deposits | $0.00 | $1,200.00 | **($1,200.00)** |
| **TOTAL** | **$1,688,766.79** | **$2,007,642.99** | **($318,876.20)** |

### *2010*

9.      For calendar year 2010, WSS reported $1,059,990.91 in total revenue on the

Settlement Statement.  Based on financial analysis of bank records obtained from CNB and

Wells Fargo and WSS' QuickBooks, WSS' revenue for 2010 was $1,444,331.83.  We have

determined that WSS underreported revenue to VA for 2010 in the amount of $384,340.92.

Based on The Contract, VA was entitled to $866,599.10 of revenue for 2010, 60 percent of the

actual gross revenue for the year.

| Customer | WSS Settlement Statements | Actual Revenue | Over/(Under) Reported |
|---|---|---|---|
| Northern Trust Golf (PGA Tour) | $62,455.00 | $62,455.00 | **$0.00** |
| Buerge Ford | $65,000.00 | $65,000.00 | **$0.00** |
| Buerge Chrysler/Jeep | $0.00 | $13,000.00 | **($13,000.00)** |
| Tumbleweed | $247,677.18 | $247,677.18 | **$0.00** |
| UCLA | $15,750.00 | $15,750.00 | **$0.00** |
| Getty | $92,500.00 | $98,700.00 | **($6,200.00)** |
| Enterprise Rent-A-Car | $196,320.00 | $196,320.00 | **$0.00** |
| Barrington Pl/Lot Income plus Misc. Film and Other Parking | $380,288.73 | $726,257.65 | **($345,968.92)** |
| Cash Deposits | $0.00 | $19,172.00 | **($19,172.00)** |
| **TOTAL** | **$1,059,990.91** | **$1,444,331.83** | **($384,340.92)** |

### *2011*

10.     For calendar year 2011, WSS reported $875,621.00 in total revenue on the Settlement Statement. Based on financial analysis of bank records obtained from CNB and Wells Fargo, WSS' revenue for 2011 was $1,232,550.97. We have determined that WSS underreported revenue to VA for 2011 in the amount of $356,929.97. Based on The Contract, VA was entitled to $739,530.58 of revenue for 2011, 60 percent of the actual gross revenue for the year.

| Customer | WSS Settlement Statements | Actual Revenue | Over/(Under) Reported |
|---|---|---|---|
| Northern Trust Golf (PGA Tour) | $62,455.00 | $48,000.00 | **$14,455.00** |
| Buerge Ford | $65,000.00 | $78,000.00 | ($13,000.00) |
| Tumbleweed | $259,548.00 | $259,548.10 | ($0.10) |
| Getty | $19,750.00 | $0.00 | **$19,750.00** |
| Enterprise Rent-A-Car | $96,320.00 | $181,704.00 | ($85,384.00) |
| Barrington Pl/Lot Income plus Misc. Film and Other Parking | $372,548.00 | $638,148.87 | ($265,600.87) |
| Cash Deposits | $0.00 | $27,150.00 | ($27,150.00) |
| **TOTAL** | **$875,621.00** | **$1,232,550.97** | **($356,929.97)** |

### *2012*

11.     For calendar year 2012, WSS reported $972,677.00 in total revenue on the Settlement Statement. Based on financial analysis of bank records obtained from CNB and Wells Fargo and WSS' QuickBooks, WSS' revenue for 2012 was $1,224,564.33. We have determined that WSS underreported revenue to VA for 2012 in the amount of $251,887.33. Based on The Contract, VA was entitled to $734,738.60 of revenue for 2012, 60 percent of the actual gross revenue for the year.

| Customer | WSS Settlement Statements | Actual Revenue | Over/(Under) Reported |
|---|---|---|---|
| Northern Trust Golf (PGA Tour) | $65,000.00 | $65,000.00 | $0.00 |
| VCI Construction | $0.00 | $10,000.00 | ($10,000.00) |
| Quicksilver Towing | $20,000.00 | $20,000.00 | $0.00 |
| Kiewit Construction | $130,900.00 | $130,900.00 | $0.00 |
| Buerge Ford | $65,000.00 | $78,000.00 | ($13,000.00) |
| Tumbleweed | $267,150.00 | $267,150.00 | $0.00 |
| Enterprise Rent-A-Car | $68,916.00 | $68,916.06 | ($0.06) |
| Barrington Pl/Lot Income plus Misc. Film and Other Parking | $355,711.00 | $561,211.27 | ($205,500.27) |
| Cash Deposits | $0.00 | $23,387.00 | ($23,387.00) |
| **TOTAL** | **$972,677.00** | **$1,224,564.33** | **($251,887.33)** |

### *2013*

12.      For calendar year 2013, WSS reported $1,391,675.00 in total revenue on the Settlement Statement.  Based on financial analysis of bank records obtained from CNB and Wells Fargo, WSS' revenue for 2013 was $1,405,461.15.  We have determined that WSS underreported revenue to VA for 2013 in the amount of $13,786.15.  Based on The Contract, VA was entitled to $843,276.69 of revenue for 2013, 60 percent of the actual gross revenue for the year.

| Customer | WSS Settlement Statements | Actual Revenue | Over/(Under) Reported |
|---|---|---|---|
| Northern Trust Golf (PGA Tour) | $60,000.00 | $60,000.00 | $0.00 |
| VCI Construction | $36,000.00 | $36,000.00 | $0.00 |
| Quicksilver Towing | $60,000.00 | $60,000.00 | $0.00 |
| Kiewit Construction | $443,351.00 | $443,351.00 | $0.00 |
| Buerge Ford | $78,000.00 | $78,000.00 | $0.00 |
| Tumbleweed | $283,800.00 | $283,800.00 | $0.00 |
| Barrington Pl/Lot Income plus Misc. Film and Other Parking | $430,524.00 | $427,253.15 | $3,270.85 |
| Cash Deposits | $0.00 | $17,057.00 | ($17,057.00) |
| **TOTAL** | **$1,391,675.00** | **$1,405,461.15** | **($13,786.15)** |

### *2014*

13.     For calendar year 2014, WSS reported $1,738,710.40 in total revenue on the Settlement Statement.  Based on financial analysis of bank records obtained from CNB and Wells Fargo, WSS' revenue for 2014 was $1,874,573.86.  We have determined that WSS underreported revenue to VA for 2014 in the amount of $135,863.46.  Based on The Contract, VA was entitled to $1,124,744.32 of revenue for 2014, 60 percent of the actual gross revenue for the year.

| Customer | WSS Settlement Statements | Actual Revenue | Over/(Under) Reported |
|---|---|---|---|
| Northern Trust Golf (PGA Tour) | $60,000.00 | $60,000.00 | $0.00 |
| VCI Construction | $30,000.00 | $40,000.00 | ($10,000.00) |
| So Cal Gas Co. | $348,750.00 | $418,500.00 | ($69,750.00) |
| Quicksilver Towing | $60,000.00 | $60,000.00 | $0.00 |
| Kiewit Construction | $373,530.00 | $421,030.00 | ($47,500.00) |
| Buerge Ford | $45,500.00 | $45,500.00 | $0.00 |
| Santa Monica Auto Group | $12,750.00 | $12,750.00 | $0.00 |
| Tumbleweed | $279,536.60 | $279,536.00 | $0.60 |
| UCLA | $70,950.00 | $74,450.00 | ($3,500.00) |
| Barrington Pl/Lot Income plus Misc. Film and Other Parking | $457,693.80 | $427,330.86 | $30,362.94 |
| Cash Deposits | $0.00 | $35,477.00 | ($35,477.00) |
| **TOTAL** | **$1,738,710.40** | **$1,874,573.86** | **($135,863.46)** |

### *2015*

14.     For calendar year 2015, WSS reported $1,681,259.08 in total revenue on the Settlement Statement.  Based on financial analysis of bank records obtained from CNB and Wells Fargo, WSS' revenue for 2015 was $1,731,261.21.  We have determined that WSS underreported revenue to VA for 2015 in the amount of $50,002.13.  Based on The Contract, VA was entitled to $1,038,756.73 of revenue for 2015, 60 percent of the actual gross revenue for the year.

| Customer | WSS Settlement Statements | Actual Revenue | Over/(Under) Reported |
|---|---|---|---|
| Westside Motorcycle Academy | $16,450.00 | $16,450.00 | $0.00 |
| VCI Construction | $50,000.00 | $50,000.00 | $0.00 |
| So Cal Gas Co. | $802,709.00 | $856,025.50 | ($53,316.50) |
| Quicksilver Towing | $60,000.00 | $60,000.00 | $0.00 |
| Santa Monica Auto Group | $49,000.00 | $49,000.00 | $0.00 |
| Santa Monica Infiniti | $18,500.00 | $18,500.00 | $0.00 |
| Tumbleweed | $283,157.53 | $283,157.53 | $0.00 |
| Barrington Pl/Lot Income plus Misc. Film and Other Parking | $401,442.55 | $340,298.43 | $61,144.12 |
| Cash Deposits | $0.00 | $57,270.00 | ($57,270.00) |
| Global Payments (Credit Card) | $0.00 | $559.75 | ($559.75) |
| **TOTAL** | **$1,681,259.08** | **$1,731,261.21** | **($50,002.13)** |

### *2016*

15.     For calendar year 2016, WSS reported $1,742,431.37 in total revenue on the Settlement Statement.  Based on financial analysis of bank records obtained from CNB and Wells Fargo, WSS' revenue for 2016 was $1,802,565.02.  We have determined that WSS underreported revenue to VA for 2016 in the amount of $60,133.65.  Based on The Contract, VA was entitled to $1,081,539.01 of revenue for 2016, 60 percent of the actual gross revenue for the year.

| Customer | WSS Settlement Statements | Actual Revenue | Over/(Under) Reported |
|---|---|---|---|
| Westside Motorcycle Academy | $16,275.00 | $16,275.00 | $0.00 |
| VCI Construction | $83,000.00 | $83,000.00 | $0.00 |
| So Cal Gas Co. | $645,920.70 | $645,920.70 | $0.00 |
| Quicksilver Towing | $10,000.00 | $10,000.00 | $0.00 |
| Santa Monica Auto Group | $60,000.00 | $60,000.00 | $0.00 |
| Tumbleweed | $283,800.00 | $283,800.00 | $0.00 |
| Barrington Pl/Lot Income plus Misc. Film and Other Parking | $643,435.67 | $607,379.20 | $36,056.47 |
| Cash Deposits | $0.00 | $53,807.00 | ($53,807.00) |
| Global Payments (Credit Card) | $0.00 | $42,383.12 | ($42,383.12) |
| **TOTAL** | **$1,742,431.37** | **$1,802,565.02** | **($60,133.65)** |

**B.     Expenses Analysis By Year**

16.     Members of the investigative team performed a detailed year-by-year analysis of WSS' expenses, which is summarized below. We determined which ordinary expenses in WSS' QuickBooks could be considered in-kind services/improvements to the VA. (Ordinary expenses in WSS' QuickBooks included all expenditures from WSS' bank and credit card statements, with the exception of state taxes and one $2,000 miscellaneous contribution in 2013) Determination was based on interviews with TILLMAN, current and former WSS employees, and ER, FM after-the-fact Accountant for WSS, as well as pertinent WSS customer records. Out of an abundance of caution and a conservative calculation of misrepresentation of in-kind services/improvements, expenses that could possibly be classified as in-kind services/improvements were accounted for as such.

17.     Additionally, in order to capture the payroll related expenses of employees providing non-revenue generating services to the benefit of VA, we included 50% of salary expense, payroll taxes expense, and workers compensation expense in our analysis. These non-revenue generating services included providing parking attendants for occasional VA events and providing parking attendants for the main patient parking lot in order to ensure unauthorized individuals were not parking in the lot.

18.     We compared these legitimate in-kind services/improvements in WSS' QuickBooks with the Settlement Statements provided by WSS and calculated the annual overstatement of in-kind services/improvements by WSS.

### *2003*

19.     Total expenses for 2003 per WSS' QuickBooks were $841,047.93. We determined that the actual in-kind services/improvements provided by WSS to VA in 2003 totaled $141,991.41. WSS reported in-kind services/improvements of $734,754.00 for 2003, which was an over-statement of $592,762.59 for the calendar year.

### *2004*

20.     Total expenses for 2004 per WSS' QuickBooks were $1,246,095.62. We determined that the actual in-kind services/improvements provided by WSS to VA in 2004 totaled $230,772.44. WSS reported in-kind services/improvements of $1,125,215.12 for 2004, which was an over-statement of $894,442.68 for the calendar year.

### *2005*

21.     Total expenses for 2005 per WSS' QuickBooks were $1,430,374.17.  We determined that the actual in-kind services/improvements provided by WSS to VA in 2005 totaled $714,167.39.  WSS reported in-kind services/improvements of $1,634,162.00 for 2005, which was an over-statement of $919,994.62 for the calendar year.

### *2006*

22.     Total expenses for 2006 per WSS' QuickBooks were $1,114,588.63.  We determined that the actual in-kind services/improvements provided by WSS to VA in 2006 totaled $215,391.18.  WSS reported in-kind services/improvements of $877,723.58 for 2006, which was an over-statement of $662,332.40 for the calendar year.

### *2007*

23.     Total expenses for 2007 per WSS' QuickBooks were $1,455,062.06.  We determined that the actual in-kind services/improvements provided by WSS to VA in 2007 totaled $487,660.33.  WSS reported in-kind services/improvements of $1,569,095.00 for 2007, which was an over-statement of $1,081,434.67 for the calendar year.

### *2008*

24.     Total expenses for 2008 per WSS' QuickBooks were $1,181,912.36.  We determined that the actual in-kind services/improvements provided by WSS to VA in 2008 totaled $323,990.83.  WSS reported in-kind services/improvements of $880,191.12 for 2008, which was an over-statement of $556,200.29 for the calendar year.

### *2009*

25.     Total expenses for 2009 per WSS' QuickBooks were $1,128,706.93.  We determined that the actual in-kind services/improvements provided by WSS to VA in 2009 totaled $293,620.61.  WSS reported in-kind services/improvements of $592,129.69 for 2009, which was an over-statement of $298,509.08 for the calendar year.

### *2010*

26.     Total expenses for 2010 per WSS' QuickBooks were $833,431.15.  We determined that the actual in-kind services/improvements provided by WSS to VA in 2010 totaled $159,923.26.  WSS reported in-kind services/improvements of $345,061.88 for 2010, which was an over-statement of $185,138.62 for the calendar year.

### *2011*

27.     Total expenses for 2011 per WSS' QuickBooks were $637,019.51. We determined that the actual in-kind services/improvements provided by WSS to VA in 2011 totaled $145,091.87. WSS reported in-kind services/improvements of $510,525.00 for 2011, which was an over-statement of $365,433.13 for the calendar year.

### *2012*

28.     Total expenses for 2012 per WSS' QuickBooks were $620,527.60. We determined that the actual in-kind services/improvements provided by WSS to VA in 2012 totaled $144,340.71. WSS reported in-kind services/improvements of $633,975.00 for 2012, which was an over-statement of $489,634.29 for the calendar year.

### *2013*

29.     Total expenses for 2013 per WSS' QuickBooks were $702,358.43. We determined that the actual in-kind services/improvements provided by WSS to VA in 2013 totaled $138,816.16. WSS reported in-kind services/improvements of $725,649.00 for 2013, which was an over-statement of $586,832.84 for the calendar year.

### *2014*

30.     Total expenses for 2014 per WSS' QuickBooks were $898,790.41. We determined that the actual in-kind services/improvements provided by WSS to VA in 2014 totaled $178,956.06. WSS reported in-kind services/improvements of $869,133.00 for 2014, which was an over-statement of $690,176.94 for the calendar year.

### *2015*

31.     Total expenses for 2015 per WSS' QuickBooks were $792,885.09. We determined that the actual in-kind services/improvements provided by WSS to VA in 2015 totaled $131,999.92. WSS reported in-kind services/improvements of $637,733.00 for 2015, which was an over-statement of $505,733.08 for the calendar year.

### *2016*

32.     Total expenses for 2016 per WSS' QuickBooks were $1,407,699.53. We determined that the actual in-kind services/improvements provided by WSS to VA in 2016 totaled $124,547.52. WSS reported in-kind services/improvements of $515,684.76.00 for 2016, which was an over-statement of $391,137.24 for the calendar year.

C.    **Total Loss to VA By Year**

33.    Members of the investigative team performed a detailed year-by-year analysis of total loss to the VA, which is summarized below. We identified the VA's share (60 percent) of the actual WSS' revenue (described above in paragraph 1 of Appendix one) and credited SCOTT with the annual calculation of WSS' expenses that could be considered in-kind services/improvements (described above in paragraph 16, 17, and 18 of Appendix one). In addition, we credited SCOTT with all settlement payments that were made by WSS to the VA, regardless of circumstances and timing in which the payments were made. The difference between the VA's share of actual revenue and the in-kind services/improvements and settlement payments provided us with a conservative total loss to the VA for each year.

*2003*

34.    Per The Contract, VA was entitled to $1,056,209.98 actual gross revenue for 2003. Actual in-kind services/improvements provided by WSS in 2003 was $141,991.41 and payments made to VA for 2003 were $205,850.40,[42] which resulted in a loss to VA of $708,368.17 for 2003.

| Loss to VA | WSS Settlement Statements | Actual Amounts per Analysis | Over/(Under) Reported |
|---|---|---|---|
| Total Revenue | $894,250.00 | $1,760,349.96 | ($866,099.96) |
| VA Share of Revenue | $536,550.00 | $1,056,209.98 | ($519,659.98) |
| In-Kind Services | $734,754.00 | $141,991.41 | $592,762.59 |
| Carry Over In-Kind Services | $0.00 | $0.00 | $0.00 |
| Settlement Payments to VA | $0.00 | $205,850.40 | ($205,850.40) |
| **Amount Owed to VA** | **($198,204.00)** | **$708,368.17** | **($906,572.17)** |
| **TOTAL LOSS TO VA FOR 2003** | | | **$708,368.17** |

---

[42] In December 2016, after VA contracting officials presented WSS with evidence of WSS' failure to report $643,714 of revenue, WSS made back payments to VA. The unreported revenue consisted of UCLA payments to WSS for parking in VA lots during construction on the UCLA campus for calendar years 2003, 2004, 2008, and 2009. VA received a lump sum payment of $386,228 on or about December 16, 2016. SCOTT knew he was under investigation in December 2016. Although payment made by a target who knows they are under criminal investigation would not (and should not) be deducted from loss calculations, I have credited WSS for this lump sum after-the-fact payment, in an abundance of caution and solely for the purposes of this affidavit.

*2004*

35.     Per The Contract, VA was entitled to $1,563,044.68 actual gross revenue for
2004.  Actual in-kind services/improvements provided by WSS in 2003 was $230,772.44 and
payments made to VA for 2003 were $37,440.00 (refer to footnote 42 above), which resulted in a
loss to VA of $1,294,832.24 for 2004.

| Loss to VA | WSS Settlement Statements | Actual Amounts per Analysis | Over/(Under) Reported |
|---|---|---|---|
| Total Revenue | $1,557,606.86 | $2,605,074.47 | ($1,047,467.61) |
| VA Share of Revenue | $934,564.12 | $1,563,044.68 | ($628,480.57) |
| In-Kind Services | $1,125,215.12 | $230,772.44 | $894,442.68 |
| Carry Over In-Kind Services | $198,204.00 | $0.00 | $198,204.00 |
| Settlement Payments to VA | $0.00 | $37,440.00 | ($37,440.00) |
| **Amount Owed to VA** | **($388,855.00)** | **$1,294,832.24** | **($1,683,687.25)** |
| **TOTAL LOSS TO VA FOR 2004** | | | **$1,294,832.24** |

*2005*

36.     Per The Contract, VA was entitled to $1,235,099.67 actual gross revenue for
2005.  Actual in-kind services/improvements provided by WSS in 2005 was $714,167.39 and no
payments were made to VA for 2005, which resulted in a loss to VA of $520,932.28 for 2005.

| Loss to VA | WSS Settlement Statements | Actual Amounts per Analysis | Over/(Under) Reported |
|---|---|---|---|
| Total Revenue | $1,809,175.09 | $2,058,499.45 | ($249,324.36) |
| VA Share of Revenue | $1,085,505.05 | $1,235,099.67 | ($149,594.62) |
| In-Kind Services | $1,634,162.00 | $714,167.39 | $919,994.61 |
| Carry Over In-Kind Services | $388,855.00 | $0.00 | $388,855.00 |
| Settlement Payments to VA | $0.00 | $0.00 | $0.00 |
| **Amount Owed to VA** | **($937,511.95)** | **$520,932.28** | **($1,458,444.23)** |
| **TOTAL LOSS TO VA FOR 2005** | | | **$520,932.28** |

*2006*

37.     Per The Contract, VA was entitled to $1,273,139.82 actual gross revenue for
2006.  Actual in-kind services/improvements provided by WSS in 2006 was $215,391.18 and no
payments were made to VA for 2006, which resulted in a loss to VA of $1,057,748.64 for 2006.

| Loss to VA | WSS Settlement Statements | Actual Amounts per Analysis | Over/(Under) Reported |
|---|---|---|---|
| Total Revenue | $1,940,407.25 | $2,121,899.70 | ($181,492.45) |
| VA Share of Revenue | $1,164,244.35 | $1,273,139.82 | ($108,895.47) |
| In-Kind Services | $877,723.58 | $215,391.18 | $662,332.40 |
| Carry Over In-Kind Services | $937,511.95 | $0.00 | $937,511.95 |
| Settlement Payments to VA | $0.00 | $0.00 | $0.00 |
| **Amount Owed to VA** | **($650,991.18)** | **$1,057,748.64** | **($1,708,739.82)** |
| **TOTAL LOSS TO VA FOR 2006** | | | **$1,057,748.64** |

*2007*

38.     Per The Contract, VA was entitled to $1,499,541.72 actual gross revenue for 2007. Actual in-kind services/improvements provided by WSS in 2007 was $487,660.33 and no payments were made to VA for 2007, which resulted in a loss to VA of $1,011,881.39 for 2007.

| Loss to VA | WSS Settlement Statements | Actual Amounts per Analysis | Over/(Under) Reported |
|---|---|---|---|
| Total Revenue | $2,145,800.64 | $2,499,236.20 | ($353,435.56) |
| VA Share of Revenue | $1,287,480.38 | $1,499,541.72 | ($212,061.34) |
| In-Kind Services | $1,569,095.00 | $487,660.33 | $1,081,434.67 |
| Carry Over In-Kind Services | $650,991.18 | $0.00 | $650,991.18 |
| Settlement Payments to VA | $0.00 | $0.00 | $0.00 |
| **Amount Owed to VA** | **($932,605.80)** | **$1,011,881.39** | **($1,944,487.19)** |
| **TOTAL LOSS TO VA FOR 2007** | | | **$1,011,881.39** |

*2008*

39.     Per The Contract, VA was entitled to $1,299,167.15 actual gross revenue for 2008. Actual in-kind services/improvements provided by WSS in 2008 was $323,990.83 and payments made to VA for 2008 were $113,688.00 (refer to footnote 42 above), which resulted in a loss to VA of $861,488.32 for 2008.

| Loss to VA | WSS Settlement Statements | Actual Amounts per Analysis | Over/(Under) Reported |
|---|---|---|---|
| Total Revenue | $1,745,837.18 | $2,165,278.58 | ($419,441.40) |
| VA Share of Revenue | $1,047,502.31 | $1,299,167.15 | ($251,664.84) |
| In-Kind Services | $880,191.12 | $323,990.83 | $556,200.29 |
| Carry Over In-Kind Services | $932,605.80 | $0.00 | $932,605.80 |
| Settlement Payments to VA | $0.00 | $113,688.00 | ($113,688.00) |
| **Amount Owed to VA** | **($765,294.61)** | **$861,488.32** | **($1,626,782.93)** |
| **TOTAL LOSS TO VA FOR 2008** | | | **$861,488.32** |

### *2009*

40.     Per The Contract, VA was entitled to $1,204,585.79 actual gross revenue for 2009. Actual in-kind services/improvements provided by WSS in 2009 was $293,620.61 and payments made to VA for 2009 were $29,250 (refer to footnote 42 above), which resulted in a loss to VA of $881,715.18 for 2009.

| Loss to VA | WSS Settlement Statements | Actual Amounts per Analysis | Over/(Under) Reported |
|---|---|---|---|
| Total Revenue | $1,688,766.79 | $2,007,642.99 | ($318,876.20) |
| VA Share of Revenue | $1,013,260.07 | $1,204,585.79 | ($191,325.72) |
| In-Kind Services | $592,129.69 | $293,620.61 | $298,509.08 |
| Carry Over In-Kind Services | $765,294.61 | $0.00 | $765,294.61 |
| Settlement Payments to VA | $0.00 | $29,250.00 | ($29,250.00) |
| **Amount Owed to VA** | **($344,164.23)** | **$881,715.18** | **($1,225,879.41)** |
| **TOTAL LOSS TO VA FOR 2009** | | | **$881,715.18** |

### *2010*

41.     Per The Contract, VA was entitled to $866,599.10 actual gross revenue for 2010. Actual in-kind services/improvements provided by WSS in 2010 was $159,923.26 and no payments were made to VA for 2010, which resulted in a loss to VA of $706,675.84 for 2010.

| Loss to VA | WSS Settlement Statements | Actual Amounts per Analysis | Over/(Under) Reported |
|---|---|---|---|
| Total Revenue | $1,059,990.91 | $1,444,331.83 | ($384,340.92) |
| VA Share of Revenue | $635,994.55 | $866,599.10 | ($230,604.55) |
| In-Kind Services | $345,061.88 | $159,923.26 | $185,138.62 |
| Carry Over In-Kind Services | $344,164.23 | $0.00 | $344,164.23 |
| Settlement Payments to VA | $0.00 | $0.00 | $0.00 |
| **Amount Owed to VA** | **($53,231.56)** | **$706,675.84** | **($759,907.40)** |
| **TOTAL LOSS TO VA FOR 2010** | | | **$706,675.84** |

### *2011*

42.     Per The Contract, VA was entitled to $739,530.58 actual gross revenue for 2011. Actual in-kind services/improvements provided by WSS in 2011 was $145,091.87 and no payments were made to VA for 2011, which resulted in a loss to VA of $594,438.71 for 2011.

| Loss to VA | WSS Settlement Statements | Actual Amounts per Analysis | Over/(Under) Reported |
|---|---|---|---|
| Total Revenue | $875,621.00 | $1,232,550.97 | ($356,929.97) |
| VA Share of Revenue | $525,372.60 | $739,530.58 | ($214,157.98) |
| In-Kind Services | $510,525.00 | $145,091.87 | $365,433.13 |
| Carry Over In-Kind Services | $53,231.56 | $0.00 | $53,231.56 |
| Settlement Payments to VA | $0.00 | $0.00 | $0.00 |
| **Amount Owed to VA** | **($38,383.96)** | **$594,438.71** | **($632,822.67)** |
| **TOTAL LOSS TO VA FOR 2011** | | | **$594,438.71** |

### *2012*

43.     Per The Contract, VA was entitled to $734,738.60 actual gross revenue for 2012. Actual in-kind services/improvements provided by WSS in 2012 was $144,340.71 and no payments were made to VA for 2012, which resulted in a loss to VA of $590,397.89 for 2012.

| Loss to VA | WSS Settlement Statements | Actual Amounts per Analysis | Over/(Under) Reported |
|---|---|---|---|
| Total Revenue | $972,677.00 | $1,224,564.33 | ($251,887.33) |
| VA Share of Revenue | $583,606.20 | $734,738.60 | ($151,132.40) |
| In-Kind Services | $633,975.00 | $144,340.71 | $489,634.29 |
| Carry Over In-Kind Services | $38,383.96 | $0.00 | $38,383.96 |
| Settlement Payments to VA | $0.00 | $0.00 | $0.00 |
| **Amount Owed to VA** | **($88,752.76)** | **$590,397.89** | **($679,150.65)** |
| **TOTAL LOSS TO VA FOR 2012** | | | **$590,397.89** |

### *2013*

44.     Per The Contract, VA was entitled to $843,276.69 actual gross revenue for 2013. Actual in-kind services/improvements provided by WSS in 2013 was $138,816.16 and payments made to VA for 2013 were $20,603.24, which resulted in a loss to VA of $683,857.29 for 2013.

| Loss to VA | WSS Settlement Statements | Actual Amounts per Analysis | Over/(Under) Reported |
|---|---|---|---|
| Total Revenue | $1,391,675.00 | $1,405,461.15 | ($13,786.15) |
| VA Share of Revenue | $835,005.00 | $843,276.69 | ($8,271.69) |
| In-Kind Services | $725,649.00 | $138,816.16 | $586,832.84 |
| Carry Over In-Kind Services | $88,752.76 | $0.00 | $88,752.76 |
| Settlement Payments to VA | $20,603.24 | $20,603.24 | $0.00 |
| **Amount Owed to VA** | $0.00 | $683,857.29 | ($683,857.29) |
| **TOTAL LOSS TO VA FOR 2013** | | | $683,857.29 |

### *2014*

45.     Per The Contract, VA was entitled to $1,124,744.32 actual gross revenue for 2014.  Actual in-kind services/improvements provided by WSS in 2014 was $178,956.06 and payments made to VA for 2014 were $174,093.24, which resulted in a loss to VA of $771,695.02 for 2014.

| Loss to VA | WSS Settlement Statements | Actual Amounts per Analysis | Over/(Under) Reported |
|---|---|---|---|
| Total Revenue | $1,738,710.40 | $1,874,573.86 | ($135,863.46) |
| VA Share of Revenue | $1,043,226.24 | $1,124,744.32 | ($81,518.08) |
| In-Kind Services | $869,133.00 | $178,956.06 | $690,176.94 |
| Carry Over In-Kind Services | $0.00 | $0.00 | $0.00 |
| Settlement Payments to VA | $174,093.24 | $174,093.24 | $0.00 |
| **Amount Owed to VA** | $0.00 | $771,695.02 | ($771,695.02) |
| **TOTAL LOSS TO VA FOR 2014** | | | $771,695.02 |

### *2015*

46.     Per The Contract, VA was entitled to $1,038,756.73 actual gross revenue for 2015.  Actual in-kind services/improvements provided by WSS in 2015 was $131,999.92 and

payments made to VA for 2015 were $75,000.00,[43] which resulted in a loss to VA of $831,756.81 for 2015.

| Loss to VA | WSS Settlement Statements | Actual Amounts per Analysis | Over/(Under) Reported |
|---|---|---|---|
| Total Revenue | $1,681,259.08 | $1,731,261.21 | ($50,002.13) |
| VA Share of Revenue | $1,008,755.45 | $1,038,756.73 | ($30,001.28) |
| In-Kind Services | $637,733.00 | $131,999.92 | $505,733.08 |
| Carry Over In-Kind Services | $0.00 | $0.00 | $0.00 |
| Settlement Payments to VA | $0.00 | $75,000.00 | ($75,000.00) |
| **Amount Owed to VA** | **$371,022.45** | **$831,756.81** | ($460,734.36) |
| **TOTAL LOSS TO VA FOR 2015** | | | **$831,756.81** |

### *2016*

47.     Per The Contract, VA was entitled to $1,081,539.01 actual gross revenue for 2016.  Actual in-kind services/improvements provided by WSS in 2016 was $124,547.52 and payments made to VA for 2016 were $75,000,[44] which resulted in a loss to VA of $881,991.49 for 2016.

| Loss to VA | WSS Settlement Statements | Actual Amounts per Analysis | Over/(Under) Reported |
|---|---|---|---|
| Total Revenue | $1,742,431.37 | $1,802,565.02 | ($60,133.65) |
| VA Share of Revenue | $1,045,458.82 | $1,081,539.01 | ($36,080.19) |
| In-Kind Services | $515,684.76 | $124,547.52 | $391,137.24 |
| Carry Over In-Kind Services | $0.00 | $0.00 | $0.00 |
| Settlement Payments to VA | $0.00 | $75,000.00 | ($75,000.00) |
| **Amount Owed to VA** | **$529,774.06** | **$881,991.49** | ($352,217.43) |
| **TOTAL LOSS TO VA FOR 2016** | | | **$881,991.49** |

---

[43] Payment was received for 2015 Settlement Statement via FedEx on June 29, 2017 after termination agreement between VA and WSS, dated January 19, 2017, was executed.  Payment was not included on 2015 Settlement Statement provided to VA.

[44] Payment was received for 2016 Settlement Statement via FedEx on September 28, 2017 after termination agreement between VA and WSS, dated January 19, 2017, was executed.  Payment was not included on 2015 Settlement Statement provided to VA.

## APPENDIX TWO:  ASSET TRACING BY YEAR

**A.     Asset Tracing By Year**

1.      Members of the investigative team have identified five bank accounts that SCOTT used between 2003 and 2016 to accumulate proceeds of the fraud, which were then used to purchase the assets described in detail below.  The five accounts were CNB account ending in 7279 ("WSS 7279"), CNB account ending in 5203 ("WSS 5203"), Wells Fargo account ending in 5540 ("WSS 5540"), Wells Fargo account ending in 3502 ("WSS 3502"), and Wells Fargo account ending in 4853 ("WSS 4853").  We performed a detailed analysis of these accounts in order to identify the amount of actual WSS revenue that was deposited into each account on an annual basis.  Per the contract, 60 percent of the actual annual revenue deposited into these accounts was owed to the VA, in in-kind services and settlement payments.  We then prepared a conservative calculation of in-kind services/improvements and identified settlement payments that were expended from each of these accounts on an annual basis.  The difference between the VA's share of actual revenue deposited into these accounts and the conservative calculation of in-kind services/improvements and/or settlement payments that were expended from these accounts during the year, represents the proceeds of the fraud SCOTT accumulated in these accounts during the year.  (Refer to the Financial Analysis detailed in Appendix One for more details regarding the calculation of loss to the VA.)

2.      The proceeds of the fraud, which SCOTT accumulated on an annual basis in the five WSS bank accounts (WSS 7279, WSS 5203, WSS 5540, WSS 3502, and WSS 4853), were used in part or in whole to purchase the assets that are listed for seizure.  (Please refer to paragraph 9 of the Affidavit for a list of the Assets.)

*2003*

| Loss to VA | WSS 5203 | WSS 5540 | WSS 4853 | TOTAL |
|---|---|---|---|---|
| Total Revenue | $875,521.13 | $590,822.88 | $294,005.95 | **$1,760,349.96** |
| VA Share of Revenue | $525,312.68 | $354,493.73 | $176,403.57 | **$1,056,209.98** |
| In-Kind Services | $69,276.41 | $13,039.87 | $59,675.13 | **$141,991.41** |
| Settlement Payments to VA | $205,850.40 | $0.00 | $0.00 | **$205,850.40** |
| **Amount Owed to VA** | **$250,185.87** | **$341,453.86** | **$116,728.44** | **$708,368.17** |
| **TOTAL LOSS TO VA FOR 2003** | | | | **$708,368.17** |

3.      During 2003, $135,000.00 was paid to MORGAN STANLEY ACCOUNT #1, via check #1196 drawn on WSS 5203 on or about November 24, 2003.

4.      Total accumulated proceeds of the fraud that were paid towards assets during 2003 consisted of $135,000 from WSS 5203.

### *2004*

| Loss to VA | WSS 5203 | WSS 7279 | WSS 4853 | WSS 3502 | TOTAL |
|---|---|---|---|---|---|
| Total Revenue | $1,915,264.03 | $306,940.85 | $189,681.44 | $193,188.15 | **$2,605,074.47** |
| VA Share of Revenue | $1,149,158.42 | $184,164.51 | $113,808.86 | $115,912.89 | **$1,563,044.68** |
| In-Kind Services | $121,736.53 | $27,234.02 | $63,998.32 | $17,803.57 | **$230,772.44** |
| Settlement Payments to VA | $0.00 | $37,440.00 | $0.00 | $0.00 | **$37,440.00**[45] |
| **Amount Owed to VA** | **$1,027,421.89** | **$119,490.49** | **$49,810.54** | **$98,109.32** | **$1,294,832.24** |
| **TOTAL LOSS TO VA FOR 2004** | | | | | **$1,294,832.24** |

5.      On or about September 27, 2004, $703,865.20 was transferred from WSS 5203 to WSS 7279, which appeared to be a transfer in order to open account WSS 7279 (on September 28, 2004, $1,540.00 was transferred back to WSS 5203 – net effect is $702,325.20).

6.      During 2004, $1,200,000.00 was paid to MORGAN STANLEY ACCOUNT #1, via check #2566 drawn on WSS 7279 on or about November 12, 2004.

7.      During 2004, $80,000.00 was paid to MORGAN STANLEY ACCOUNT #2, from MORGAN STANLEY ACCOUNT #1.

8.      During 2004, $117,000.00 was paid toward the down payment for the Malibu House via check #1258 drawn on WSS 5203.

9.      During 2004, at least $21,535.29 was charged for furniture on AMEX 2001 and AMEX 3009 (eventually became AMEX 5004). In 2004, at least 12 payments were made to AMEX out of CNB 5203 totaling at least $459,814.17.

10.      Total accumulated proceeds of the fraud that were paid towards assets during 2004 consisted of $859,255.69 from WSS 7279 ($702,325.20 was transferred from WSS 5203

---

[45] Refer to footnote 42 for details surrounding the circumstances and timing in which this settlement payment was made. While SCOTT remitted payment in the amount of $37,440.00 for 2004, he did not do so until 2016. Therefore, while we gave SCOTT credit in the calculation of total loss to the VA for this payment, he had retained this amount owed to the VA in WSS 7279 and did not provide any settlement payments to the VA in 2004. Rather, this money was used in 2004, in combination with other proceeds of the fraud, to help fund MORGAN STANLEY ACCOUNT #1 in 2004.

during the year prior to being for MORGAN STANLEY ACCOUNT #1), $138,535.29 from WSS 5203, and $80,000.00 from MORGAN STANLEY ACCOUNT #1.

**2005**

| Loss to VA | WSS 7279 | WSS 3502 | TOTAL |
|---|---|---|---|
| Total Revenue | $1,484,032.98 | $574,466.47 | **$2,058,499.45** |
| VA Share of Revenue | $890,419.79 | $344,679.88 | **$1,235,099.67** |
| In-Kind Services | $653,551.31 | $60,616.08 | **$714,167.39** |
| Settlement Payments to VA | $0.00 | $0.00 | **$0.00** |
| **Amount Owed to VA** | **$236,868.48** | **$284,063.80** | **$520,932.28** |
| **TOTAL LOSS TO VA FOR 2005** | | | **$520,932.28** |

11.     During 2005, $206,000.00 was paid to Ferrari of Beverly Hills for The FERRARI F430, via check #2812 drawn on WSS 7279.

12.     During 2005, at least $13,103.04 was charged for furniture on AMEX 3009 (eventually became AMEX 5004). In 2005, at least 14 payments were made to AMEX out of CNB 7279 totaling at least $460,610.65.

13.     Total accumulated proceeds of the fraud that were paid towards assets during 2005 consisted of $219,103.04 from WSS 7279.

**2006**

| Loss to VA | WSS 7279 | WSS 3502 | TOTAL |
|---|---|---|---|
| Total Revenue | $1,772,670.77 | $349,228.93 | **$2,121,899.70** |
| VA Share of Revenue | $1,063,602.46 | $209,537.36 | **$1,273,139.82** |
| In-Kind Services | $125,903.06 | $89,488.12 | **$215,391.18** |
| Settlement Payments to VA | $0.00 | $0.00 | **$0.00** |
| **Amount Owed to VA** | **$937,699.40** | **$120,049.24** | **$1,057,748.64** |
| **TOTAL LOSS TO VA FOR 2006** | | | **$1,057,748.64** |

14.     During 2006, at least $17,023.98 was charged for furniture on AMEX 5004. In 2006, at least 13 payments were made to AMEX out of CNB 7279 totaling at least $495,000.00.

15.     Total accumulated proceeds of the fraud that were paid towards assets during 2006 consisted of $17,023.98 from WSS 7279.

*2007*

| Loss to VA | WSS 7279 | WSS 3502 | TOTAL |
|---|---|---|---|
| Total Revenue | $2,346,474.45 | $152,761.75 | **$2,499,236.20** |
| VA Share of Revenue | $1,407,884.67 | $91,657.05 | **$1,499,541.72** |
| In-Kind Services | $398,717.90 | $88,942.43 | **$487,660.33** |
| Settlement Payments to VA | $0.00 | $0.00 | **$0.00** |
| **Amount Owed to VA** | **$1,009,166.77** | **$2,714.62** | **$1,011,881.39** |
| **TOTAL LOSS TO VA FOR 2007** | | | **$1,011,881.39** |

16.     During 2007, $29,500.00 was paid to NCB for the mortgage on 804B, via checks drawn on WSS 7279.

17.     During 2007, at least $279.93 was charged for furniture on AMEX 5004. In 2007, at least 20 payments were paid to AMEX from WSS 7279 totaling at least $564,150.00.

18.     Total accumulated proceeds of the fraud that were paid towards assets during 2007 consisted of $29,779.93 from WSS 7279.

*2008*

| Loss to VA | WSS 7279 | WSS 3502 | TOTAL |
|---|---|---|---|
| Total Revenue | $1,501,777.18 | $663,501.40 | **$2,165,278.58** |
| VA Share of Revenue | $901,066.31 | $398,100.84 | **$1,299,167.15** |
| In-Kind Services | $248,965.18 | $75,025.65 | **$323,990.83** |
| Settlement Payments to VA | $113,688.00 | $0.00 | **$113,688.00** |
| **Amount Owed to VA** | **$538,413.13** | **$323,075.19** | **$861,488.32** |
| **TOTAL LOSS TO VA FOR 2008** | | | **$861,488.32** |

19.     During 2008, $35,000.00 was paid to NCB for the mortgage on 804B, via checks drawn on WSS 7279.

20.     During 2008, at least $2,554.70 was charged for furniture on AMEX 5004. In 2008, at least 35 payments were made to AMEX out of WSS 7279 totaling at least $617,965.23.

21.     Total accumulated proceeds of the fraud that were paid towards assets during 2008 consisted of $37,554.70 from WSS 7279.

*2009*

| Loss to VA | WSS 7279 | WSS 3502 | TOTAL |
|---|---|---|---|
| Total Revenue | $1,536,097.44 | $471,545.55 | **$2,007,642.99** |
| VA Share of Revenue | $921,658.46 | $282,927.33 | **$1,204,585.79** |
| In-Kind Services | $209,969.40 | $83,651.21 | **$293,620.61** |
| Settlement Payments to VA | $29,250.00 | $0.00 | **$29,250.00** |
| **Amount Owed to VA** | **$682,439.06** | **$199,276.12** | **$881,715.18** |
| **TOTAL LOSS TO VA FOR 2009** | | | **$881,715.18** |

22.    During 2009, $29,300.00 was paid to NCB for the mortgage on 804B, via checks drawn on WSS 7279.

23.    During 2009, at least $6,262.72 was charged for furniture on AMEX 5004. In 2009, at least 36 payments were made to AMEX out of WSS 7279 totaling at least $453,580.96.

24.    Total accumulated proceeds of the fraud that were paid towards assets during 2009 consisted of $35,562.72 from WSS 7279.

*2010*

| Loss to VA | WSS 7279 | WSS 3502 | TOTAL |
|---|---|---|---|
| Total Revenue | $997,011.98 | $447,319.85 | **$1,444,331.83** |
| VA Share of Revenue | $598,207.19 | $268,391.91 | **$866,599.10** |
| In-Kind Services | $65,091.30 | $94,831.96 | **$159,923.26** |
| Settlement Payments to VA | $0.00 | $0.00 | **$0.00** |
| **Amount Owed to VA** | **$533,115.89** | **$173,559.95** | **$706,675.84** |
| **TOTAL LOSS TO VA FOR 2010** | | | **$706,675.84** |

25.    During 2010, $38,400.00 was paid to NCB for the mortgage on 804B, via checks drawn on WSS 7279.

26.    During 2010, $153,154.00 was paid to FECU for the mortgage and/or HELOC on the Malibu House, via checks drawn on WSS 7279.

27.    Total accumulated proceeds of the fraud that were paid towards assets during 2010 consisted of $191,554.00 from WSS 7279.

*2011*

| Loss to VA | WSS 7279 | WSS 3502 | TOTAL |
|---|---|---|---|
| Total Revenue | $800,942.89 | $431,608.08 | **$1,232,550.97** |
| VA Share of Revenue | $480,565.73 | $258,964.85 | **$739,530.58** |
| In-Kind Services | $51,601.19 | $93,490.68 | **$145,091.87** |
| Settlement Payments to VA | $0.00 | $0.00 | **$0.00** |
| **Amount Owed to VA** | **$428,964.54** | **$165,474.17** | **$594,438.71** |
| **TOTAL LOSS TO VA FOR 2011** | | | **$594,438.71** |

28.     During 2011, $29,985.93 was paid to FECU toward the principal on the loan for The CORVETTE, via checks drawn on WSS 7279.

29.     During 2011, $30,900.00 was paid to NCB for the mortgage on 804B, via checks drawn on WSS 7279.

30.     During 2011, $209,577.73 was paid to FECU for the mortgage and/or HELOC on the Malibu House, via checks drawn on WSS 7279.

31.     During 2011, at least $1,579.42 was charged for furniture on AMEX 5004.  In 2011, at least 33 payments were made to AMEX out of WSS 7279 totaling at least $421,186.70.

32.     Total accumulated proceeds of the fraud that were paid towards assets during 2011 consisted of $272,043.08 from WSS 7279.

*2012*

| Loss to VA | WSS 7279 | WSS 3502 | TOTAL |
|---|---|---|---|
| Total Revenue | $978,826.58 | $245,737.75 | **$1,224,564.33** |
| VA Share of Revenue | $587,295.95 | $147,442.65 | **$734,738.60** |
| In-Kind Services | $24,270.57 | $120,070.14 | **$144,340.71** |
| Settlement Payments to VA | $0.00 | $0.00 | **$0.00** |
| **Amount Owed to VA** | **$563,025.38** | **$27,372.51** | **$590,397.89** |
| **TOTAL LOSS TO VA FOR 2012** | | | **$590,397.89** |

33.     During 2012, $51,299.74 was paid toward the principal on the loan for The CORVETTE, via checks drawn on WSS 7279.

34.     During 2012, $30,600.00 was paid to NCB for 804B, via checks drawn on WSS 7279.

35.     During 2012, $48.55 was paid to PNC Bank for the mortgage on 1404P, via checks drawn on WSS 7279.

36.     During 2012, $59,664.03 was paid to FECU for the mortgage and/or HELOC on the Malibu House via checks drawn on WSS 7279.

37.     During 2012, at least $5,650.00 was charged for furniture on AMEX 5004.  In 2012, at least 31 payments were made to AMEX out of WSS 7279 totaling at least $414,493.75.

38.     Total accumulated proceeds of the fraud that were paid towards assets during 2012 consisted of $147,262.32 from WSS 7279.

### *2013*

| Loss to VA | WSS 7279 | WSS 3502 | TOTAL |
|---|---|---|---|
| Total Revenue | $1,183,983.00 | $221,478.15 | **$1,405,461.15** |
| VA Share of Revenue | $710,389.80 | $132,886.89 | **$843,276.69** |
| In-Kind Services | $49,869.43 | $88,946.73 | **$138,816.16** |
| Settlement Payments to VA | $20,603.24 | $0.00 | **$20,603.24** |
| **Amount Owed to VA** | **$639,917.13** | **$43,940.16** | **$683,857.29** |
| **TOTAL LOSS TO VA FOR 2013** | | | **$683,857.29** |

39.     During 2013, SCOTT purchased The TOP GUN BOAT for $265,550.00, with proceeds from SCOTT 0714.  Deposits into SCOTT 0714 during 2013, consisted of $60,000.00 in rents from the Malibu House, $42,000.00 in rents from 804B, and $450,000.00 from the sale of furniture in the Malibu House.  The Malibu House, including the furniture that was purchased at the time SCOTT owned the residence, and 804B have been paid for in part or in whole with proceeds of the fraud.  During the time SCOTT owned the Malibu House we have identified at least $68,000.00 of furniture that was purchased on AMEX 5004 (previously AMEX 2001 and AMEX 3009), the balance of which was subsequently paid by WSS 5203 and WSS 7279.

40.     During 2013, $22,000.00 down payment was paid for The SHELBY, via check #5990 drawn on WSS 7279.  There was also $2,348.92 paid to Bank of the Pacific toward the principal on the loan for The SHELBY, via checks drawn on WSS 7279.

41.     During 2013, $44,994.33 was paid toward the principal on the loan for The CORVETTE, via checks drawn on WSS 7279.

42.     During 2013, $22,350.00 was paid to NCB for the mortgage on 804B, via checks drawn on WSS 7279.

43.     During 2013, $1,478.24 was paid to PNC Bank for the mortgage on 1404P, via checks drawn on WSS 7279.

44.     During 2013, $20,000 down payment was paid for The FERRARI CALIFORNIA via AMEX 5004.  AMEX 5004 was paid with checks and Automated Clearing House payments from WSS 7279.  In 2013, at least 34 payments were made to AMEX out of WSS 7279 totaling at least $583,463.40.

45.     During 2013, at least $728.12 was charged for furniture on AMEX 5004.  In 2013, at least 34 payments were made to AMEX out of WSS 7279 totaling at least $583,463.40.

46.     Total accumulated proceeds of the fraud that were paid towards assets during 2013 consisted of $113,899.61 from WSS 7279, at least $68,000.00 from the sale of furniture and at least $102,000.00 in rents.

*2014*

| Loss to VA | WSS 7279 | WSS 3502 | TOTAL |
|---|---|---|---|
| Total Revenue | $1,668,700.00 | $205,873.86 | $1,874,573.86 |
| VA Share of Revenue | $1,001,220.00 | $123,524.32 | $1,124,744.32 |
| In-Kind Services | $73,974.05 | $104,982.01 | $178,956.06 |
| Settlement Payments to VA | $174,093.24 | $0.00 | $174,093.24 |
| **Amount Owed to VA** | **$753,152.71** | **$18,542.31** | **$771,695.02** |
| **TOTAL LOSS TO VA FOR 2014** | | | **$771,695.02** |

47.     During 2014, $3,042.26 was paid to Bank of the Pacific toward the principal on the loan for The SHELBY, via checks drawn on WSS 7279.

48.     During 2014, $41,359.64 was paid to FECU toward the principal on the loan for The CORVETTE, via checks drawn on WSS 7279.

49.     During 2014, $8,763.41 was paid to FECU toward the principal for the loan for The MB S65V, via checks drawn on WSS 7279.  Also during 2014, SCOTT charged the down payment of $2,000 and another $21,215.07 upon receipt of the vehicle to AMEX 5004.  AMEX 5004 was subsequently paid for by proceeds from WSS 7279.

50.     During 2014, $24,400.00 was paid to NCB for the mortgage on 804B, via checks drawn on WSS 7279.

51.     During 2014, $2,581.15 was paid to PNC Bank for the mortgage on 1404P, via checks drawn on WSS 7279.

52.     Total accumulated proceeds of the fraud that were paid towards assets during
2014 consisted of $103,361.53 from WSS 7279.

### 2015

| Loss to VA | WSS 7279 | WSS 3502 | TOTAL |
|---|---|---|---|
| Total Revenue | $1,458,471.78 | $272,789.43 | $1,731,261.21 |
| VA Share of Revenue | $875,083.07 | $163,673.66 | $1,038,756.73 |
| In-Kind Services | $22,008.79 | $109,991.13 | $131,999.92 |
| Settlement Payments to VA | $75,000.00 | $0.00 | $75,000.00 |
| Amount Owed to VA | $778,074.28 | $53,682.53 | $831,756.81 |
| TOTAL LOSS TO VA FOR 2015 | | | $831,756.81 |

53.     During 2015, $214,395.00 was paid to Woodside Credit as a down payment for
The FERRARI F40, via check #1273 drawn on SCOTT 6612. The funds in SCOTT 6612 at the
time the check cleared on or about January 22, 2015 consisted of $80,000.00 from MORGAN
STANLEY ACCOUNT #1 and $130,000.00 directly or indirectly from WSS 7279 through
pervasive comingling of funds from personal and business accounts.

54.     During 2015, $32,240.43 was paid to Bank of the Pacific toward the principal on
the loan for The FERRARI F40, from MORGAN STANLEY ACCOUNT #1.

55.     During 2015, $1,585.34 was paid to Bank of the Pacific toward the principal on
the loan for The SHELBY, via checks drawn on WSS 7279.

56.     During 2015, $27,450.07 was paid toward the principal on the loan for The
CORVETTE, via checks drawn on WSS 7279.

57.     During 2015, $29,235.00 was paid for The BRONCO, via check #1387, drawn on
SCOTT 6612. The balance in the account prior to the check clearing on or about September 23,
2015 was $3,115.64. When the check cleared, it created a negative balance. Three other checks
totaling $5,216.33 payable to two other payees, also cleared on or about September 23, 2015 and
September 24, 2015. On or about September 25, 2015 a $40,000.00 transfer was made from
WSS 7279 to SCOTT 6612, covering the entire purchase price and negative balance created by
the purchase of The BRONCO.

58.     During 2015, $17,883.63 was paid to FECU toward the principal for the loan for
The MB S65V, via checks drawn on WSS 7279.

59.     During 2015, $24,000.00 was paid to NCB for the mortgage on 804B, via checks drawn on WSS 7279.

60.     During 2015, $3,170.22 was paid to PNC Bank for the mortgage on 1404P, via checks drawn on WSS 7279.

61.     During 2015, $1,009,000.00 was paid to BST Escrow for the down payment on 1209P, via check drawn on SCOTT 6612.  This amount was comprised in part of $200,000.00 from MORGAN STANLEY ACCOUNT #1 and $770,000.00 from TD 3394.

62.     Total accumulated proceeds of the fraud that were paid towards assets during 2015 consisted of $233,324.26 from WSS 7279, $312,240.43 from MORGAN STANLEY ACCOUNT #1, and $770,000 from TD 3394.

### 2016

| Loss to VA | WSS 7279 | WSS 3502 | TOTAL |
|---|---|---|---|
| Total Revenue | $1,482,173.70 | $320,391.32 | **$1,802,565.02** |
| VA Share of Revenue | $889,304.22 | $192,234.79 | **$1,081,539.01** |
| In-Kind Services | $13,788.65 | $110,758.87 | **$124,547.52** |
| Settlement Payments to VA | $75,000.00 | $0.00 | **$75,000.00** |
| **Amount Owed to VA** | **$800,515.57** | **$81,475.92** | **$881,991.49** |
| **TOTAL LOSS TO VA FOR 2016** | | | **$881,991.49** |

63.     During 2016, $28,627.73 was paid to Bank of the Pacific toward the principal for the loan for The FERRARI F40, from MORGAN STANLEY ACCOUNT #1.

64.     During 2016, SCOTT purchased The MCLAREN for $175,000.00.  Payments from MORGAN STANLEY ACCOUNT #1 accounted for $150,000.00 of the purchase price for The MCLAREN.

65.     During 2016, $8,546.36 was paid to FECU toward the principal for the loan for The MB S65V, via checks drawn on WSS 7279.

66.     During 2016, $18,400.00 was paid to NCB for the mortgage on 804B, via checks drawn on WSS 7279.

67.     During 2016, $2,608.89 was paid to PNC Bank for the mortgage on 1404P, via checks drawn on WSS 7279.

68.     Total accumulated proceeds of the fraud that were paid towards assets during 2016 consisted of $29,555.25 from WSS 7279 and 178,627.73 from MORGAN STANLEY ACCOUNT #1.